248 F.2d 232
 NORTH DRIVE-IN THEATRE CORPORATION, Appellant and Cross-Appellee,
v.
PARK-IN THEATRES, Inc.; Park-In Theatres Company; Willis Warren Smith, Vigor Cranston Smith, Richard M. Hollingshead, Jr., Annie C. Boyle, Appellees and Cross-Appellants.
DENVER DRIVE-IN THEATRE CORPORATION, Appellant and Cross-Appellee,
v.
PARK-IN THEATRES, Inc.; Park-In Theatres Company; Willis Warren Smith, Vigor Cranston Smith, Richard M. Hollingshead, Jr., Annie C. Boyle, Appellees and Cross-Appellants.
SOUTH DRIVE-IN THEATRE CORPORATION, Appellant and Cross-Appellee,
v.
PARK-IN THEATRES, Inc.; Park-In Theatres Company; Willis Warren Smith, Vigor Cranston Smith, Richard M. Hollingshead, Jr., Annie C. Boyle, Appellees and Cross-Appellants.
WEST DRIVE-IN THEATRE CORPORATION, Appellant and Cross-Appellee,
v.
PARK-IN THEATRES, Inc.; Park-In Theatres Company; Willis Warren Smith, Vigor Cranston Smith, Richard M. Hollingshead, Jr., Annie C. Boyle, Appellees and Cross-Appellants.
 Nos. 5507-5514.
 United States Court of Appeals Tenth Circuit.
 August 22, 1957.
 
 William E. Doyle, Denver, Colo. (Stinson, Mag, Thomson, McEvers & Fizzell, John M. Phillips, Dick H. Woods, Kansas City, Mo., and H. B. Van Valkenburgh, III, Denver, Colo., appeared with him on the brief) for appellants and cross-appellees.
 Leonard L. Kalish, Philadelphia, Pa., (Kenneth W. Robinson and Robert D. Charlton, Denver, Colo., appeared with him on the brief) for appellee and cross-appellant.
 Before BRATTON, Chief Judge, and HUXMAN and MURRAH, Circuit Judges.
 MURRAH, Circuit Judge.
 
 
 1
 In these consolidated suits to recover royalties on license agreements under a patent for a drive-in theatre, the licensees appealed from judgments for the licensor. Federal jurisdiction is based upon requisite diversity of citizenship and amount in controversy.
 
 
 2
 As the owner of the Hollingshead Patent for a drive-in theatre, the appellee, Park-In Theatres, Inc., entered into four separate license contracts, effective July 1, 1948, with the respective affiliated corporate appellants. Each of the agreements in identical language granted to each of the appellants a license to construct and operate one patented drive-in theatre within a certain quarter segment of the territory bounded by a circle within a thirty-mile radius, centered in the City of Denver, Colorado. The contracts provided for: (a) a down payment of $1,000.00 upon the execution and delivery of the contract; (b) either 3½ percent of the net box office receipts or a lump sum royalty based on the car capacity of the theatre; and (c) costs and expenses, including counsel fees incurred in the prosecution of suits if the moneys required to be paid by the contracts are recovered by such suit.
 
 
 3
 Prior to the execution of the contracts in suit, Park-In entered into two license agreements on July 25, 1946, with Leonard J. Albertini and William A. Walthen for the building and operation of two drive-in theatres within the same territory. The rights under these contracts were later assigned to appellant, Denver Drive-In Theatres Corporation, and the "East Drive-In Theatre" was built under one of these agreements, and was operated thereunder until the execution and delivery of the contracts herein sued upon.
 
 
 4
 While the North Drive-In Theatre was being constructed by Carvue Corporation without a license, Park-In notified Carvue that the construction was an infringement of the Hollingshead Patent. Apparently as a consequence of this notice of infringement, Carvue sold the completed and operating theatre to the appellant, North Drive-In Theatres Corporation, effective September 1, 1948. The South Drive-In and the West Drive-In Theatres were subsequently constructed under the terms of the license agreements and in accordance with the Hollingshead Patent. Each of the four licensees elected to pay 3½ percent of the net box office receipts in lieu of a lump sum royalty. None of the appellants paid the $1,000.00 down payment provided in the agreements, but part payments were made on the "patent royalty" and "license fee royalty" for the 1948 season, and apparently credited to the East Drive-In Theatre operations.
 
 
 5
 While Park-In was threatening to cancel the licenses for nonpayment of the "back royalties", and on April 8, 1949, the Hollingshead Patent was adjudged invalid for lack of invention by the First Circuit Court of Appeals. Loew's Drive-In Theatres, Inc., v. Park-In Theatres, Inc., 1 Cir., 174 F.2d 547. Soon thereafter, appellees notified appellants of the decision, explaining that a petition for certiorari was being filed with the Supreme Court. Certiorari was denied on October 10, 1949. 338 U.S. 822, 70 S. Ct. 68, 94 L.Ed. 499. Apparently nothing further was said or done by any of the parties concerning the patent or the payment of royalties. Each of the appellants, however, continued to operate its theatre until after May 1950, when the Hollingshead Patent expired and these suits were commenced to recover the unpaid down payments and accrued royalties under the respective license agreements.
 
 
 6
 The appellants interposed numerous defenses, the first of which was that the adjudication of invalidity in the First Circuit operated to evict the licensees from their exclusive right under the license agreements, with consequent failure of consideration. The trial court held that the agreements granted an exclusive license to construct and use the patented theatre, but that the adjudication of invalidity did not evict the appellants from such right so as to relieve them of their obligations to pay royalties for three reasons: "(a) the geographic area within which the defendants were licensed is not within the First Circuit; (b) the license under the Hollingshead Patent was not the only consideration for the payment of royalty; and (c) the contracts expressly dealt with the rights of the parties in the event of an adjudication of the invalidity of the patent, giving to defendants the option to terminate the agreement upon such eventuality and defendants failed to exercise such right."
 
 
 7
 On the question of the significance of the geographic area, the trial court apparently had in mind the rule in Triplett v. Lowell, 297 U.S. 638, 56 S.Ct. 645, 80 L.Ed. 949, to the effect that the adjudication of invalidity of a patent in one jurisdiction is no bar to the maintenance of a suit for infringement of the same patent between different parties in another jurisdiction. The rule is but another application of the familiar principle of res judicata. But, without derogating from Triplett, some courts hold that adjudication of invalidity in one jurisdiction works an eviction of an exclusive license in another jurisdiction, with the resultant failure of consideration and unenforceability. The reason for the rule is that while the judgment of invalidity is binding only upon the parties to that suit, the monopoly granted by the license is nevertheless destroyed or impaired by the judgment, and since it is the sole consideration for the payment of the royalties, the consideration fails with the monopoly. The same authority concedes the inapplicability of the rule to a nonexclusive license on the grounds that it grants no monopoly but is merely a covenant not to sue. See Automatic Radio Mfg. Co. v. Hazeltine Research, 1 Cir., 176 F.2d 799; 1 Williston, Rev.Ed., § 137, p. 482. There is respectable authority, however, for saying that an adjudication of invalidity by a court of competent jurisdiction works an eviction, whether exclusive or not. Drackett Chemical Co. v. Chamberlain Co., 6 Cir., 63 F.2d 853; National Foam System v. Urquhart, D.C., 103 F.Supp. 433; Wynne v. Aluminum Awning Products Co., D. C., 148 F.Supp. 212. The question of course is one of local contract law on which the courts are not in complete agreement. See Automatic Radio Mfg. Co. v. Hazeltine Research, supra; Jungerson v. Kaysen, 173 Pa.Super. 114, 95 A.2d 347; Autographic Register Co. v. Philip Hano Co., 1 Cir., 198 F.2d 208; Appleton Toy & Furn. Co. v. Lehman, Co., 7 Cir., 165 F.2d 801.
 
 
 8
 On the theory that eviction turns on whether the license is exclusive or nonexclusive, the parties lay emphasis on that factual issue. But, in the view we take of the case, we have no occasion to resolve the question of exclusiveness or whether the license agreements can be supported by valid considerations independent of the monopoly under the Hollingshead Patent. For we are convinced that the trial court was clearly right in the conclusion that the parties had anticipated the legal problems arising from an adjudication of invalidity and had contracted with respect to that very eventuality; and that the terms of their contract govern the lawsuit. Evidently anticipating the detrimental effect of an adjudication of invalidity, the parties specifically agreed that in the event the patent was held invalid by a final judgment of any court of competent jurisdiction, which was not further reviewable, the licensees might cancel and terminate the license as of any date upon one month's written notice to licensor.
 
 
 9
 Upon the finality of the judgment of invalidity in the First Circuit, the licensee undoubtedly had the option to rescind the contract and to take his chances in the field of open competition in the Denver area; or they could choose, as they did, to take advantage of whatever protection the patent afforded in an unlitigated jurisdiction. The appellants were undoubtedly aware that no one except the successful party to the litigation in the First Circuit could practice the patent covered by the license agreements with immunity from the heavy burdens of infringement litigation, the prosecution of which was the sole responsibility of the licensor under the license; and that the continued hazard of unauthorized use in the absence of, or during the pendency of litigation would afford the licensees some measure of beneficial protection under their licenses. Having availed themselves of the benefits of the protection thus afforded, the appellants undoubtedly waived their permissive rights to rescind. Hefferan v. Freebairn, Cal.App., 207 P.2d 602; Morse v. Kogle, 162 Kan. 558, 178 P.2d 275, and cases cited; Neet v. Holmes, 25 Cal.2d 447, 154 P.2d 854; Lichter v. Goss, 7 Cir., 232 F.2d 715.
 
 
 10
 The appellants next contend that the license agreements, when considered by the whole of their parts, are so restrictively monopolistic in restraint of trade as to be contrary to public policy and unenforceable. Particularly they say that the license agreement by design and effect, extends the monopoly beyond the scope of the patent. They point to that provision in the license providing in substance that if the licensee "desires to construct, make, build or operate any additional drive-in theatres within the territory defined in the granting clause", it may do so by first entering into a separate license agreement with the licensor "in respect to each and every such drive-in theatre prior to the commencement of its construction, which separate license agreement shall be precisely the same" as the agreements in suit.
 
 
 11
 The appellants construe the words "any additional drive-in theatre" as forbidding the licensee to construct any other drive-in theatres, whether covered by the subject matter patent or not, and then say that so construed, this provision operates to extend the patent beyond its legitimate scope — hence a prohibited misuse. Prior to the execution of these agreements, more restrictive clauses in appellee's license agreements had been condemned as a misuse in Park-In Theatres v. Paramount-Richards Theatres, D.C., 81 F. Supp. 466; Id., D.C., 90 F.Supp. 727, 730. Apparently as a consequence of this litigation, the licensor reframed this provision of its contract to read as we have recited. The trial court construed the critical words as meaning any drive-in covered by the patent. Surely the words are susceptible of such construction and we will not give them a sinister meaning if they are susceptible of a legitimate one. No such construction of the contract was asserted by the appellees and we should accord it a lawful interpretation.
 
 
 12
 The appellees also point to the "right-of-assignment" clause under which, in the event of a sale of the theatre, the licensee-assignor unconditionally guarantees the payment of the royalties to the licensor; the "percentage royalty inspection" clause giving the licensor complete access to the books and records of the assignee with a large measure of control over the business; the "guaranteed-operations" clause requiring the theatre to be operated twenty-four weeks of the year on penalty of royalty requirements, as evidence of an unlawful monopolistic purpose. But we can find nothing in these restrictions upon the exercise of the granted privilege which would have the unlawful effect of enlarging the monopoly granted the licensor by the patent. See Williams v. Hughes Tool Co., 10 Cir., 186 F.2d 278, 285.
 
 
 13
 The trial court allowed interest on the accrued and unpaid royalties, but disallowed interest on the unpaid down payments. It did so in accordance with what it deemed to be applicable state law, determinable by resort to the conflict of laws rule of the forum — Colorado. And see Klaxon Co. v. Stentor Electric Mfg. Co., 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477; Autographic Register Co. v. Philip Hano Co., 1 Cir., 198 F.2d 208. Following the applicable Colorado conflict of laws rule, the court found only Hays v. Arbuckle, 72 Colo. 328, 211 P. 101, on the question of what state law governs a claim for interest as damages. It finally concluded that this case did not establish a conflict of laws rule on this point, but that other "available data" indicates that Colorado follows the general rule that the law of the place of performance governs; and, inasmuch as New Jersey, where the royalty payments were made, was the place of performance, the laws of that state governed the allowance of interest. The court concluded that under the New Jersey rule, interest is allowed in accordance with general equitable principles. And while the court thought New Jersey law permitted some discretion, it was also constrained to believe that it would be an abuse of discretion to fail to award interest on a liquidated claim absent compelling equitable considerations. Finding no such considerations with respect to the unpaid royalties, the court allowed interest thereon from due date. Concerning the $1,000.00 unpaid down payments, however, the court concluded that since they were payable simultaneously with the execution of the respective contracts, and that the licensor had failed to insist that the payments be made at that time, and also failed to make demands for about five years thereafter, the licensees were lulled into the belief that such payments might be excused.
 
 
 14
 On the allowance of interest as damages in diversity litigation, we have followed the general rule to the effect that the law of the place of performance governs. Southern Painting Co. of Tenn. v. United States, 10 Cir., 222 F.2d 431; Ottinger v. United States, 10 Cir., 230 F. 2d 405; T. & M. Transportation Co. v. S. W. Shattuck Chemical Co., 10 Cir., 158 F.2d 909; Leader Clothing Co. v. Fidelity & Casualty Co., 10 Cir., 237 F.2d 7. And see Restatement Conflict of Laws §§ 413 and 418. In none of these cases, however, was the conflict of laws rule of the forum invoked or followed. It is invoked here and we agree with the trial court that it is applicable and controlling. See Klaxon Co. v. Stentor Electric Mfg. Co., supra. But we cannot agree with the trial court that Hays v. Arbuckle, supra, does not establish a conflict of laws rule for the allowance of interest, for that case cites and quotes Story on Conflict of Laws to the effect that in the absence of an agreement, and when the "claim for interest is because of delay of payment after the principal is due, it is now generally agreed that the interest is to be computed according to the law of the place where the judgment is recovered * * *." And see Federal Surety Co. v. A. Bentley & Sons Co., 6 Cir., 51 F.2d 24, 78 A.L.R. 1041; Annotation, 78 A.L. R. 1047, 1059. We must conclude therefore that the law of the forum controls.
 
 
 15
 Applicable Colorado statutes on interest provide in presently material part that "creditors shall be allowed to receive interest, when there is no agreement as to the rate thereof, at the rate of six percent per annum * * * on money due on account from the date when the same became due * * *." § 1-2, Chap. 73, Rev.Stat.Colo.1953. This statute in its present form has been carried over in to the law of Colorado from early time, and the Colorado courts have traditionally required the allowance of interest on liquidated claims. Harvey v. Denver & R. G. R. Co., 56 Colo. 570, 139 P. 1098; Donley v. Bailey, 48 Colo. 373, 110 P. 65; Wells v. Crawford, 23 Colo. App. 103, 127 P. 914. This court has given the statute a like construction. City of Denver v. Barber Asphalt Paving Co., 8 Cir., 141 F. 69; T. & M. Transportation Co. v. S. W. Shattuck Chemical Co., supra; Baer Bros. Land & Cattle Co. v. Reed, 10 Cir., 197 F.2d 569. The appellants deny that the claims for unpaid royalty were liquidated, but they were readily computable by simple mathematical calculations, and the mere fact that they were in dispute does not preclude the recovery of interest thereon. T. & M. Transportation Co. v. S. W. Shattuck Chemical Co., supra.
 
 
 16
 The appellants attack that part of the judgment of the court which allows the recovery of $1,000.00 down payments provided to be paid upon the execution of each of the license agreements. In the first place, they say that it was never intended that they should be paid; and in the second place, the claims were barred by the six-year statute of limitations. They point to the fact that the obligations, if any, accrued on the date of the execution of the respective agreements, July 1, 1948, but that no reference to them was made in the complaints filed in 1950; that the first demand was made on the trial of the case, August 15, 1955, when appellees were granted leave to amend the complaints by interlineation to allege that the defendant "has not paid any part of the license fees specified in the down-payment clause of the aforesaid license agreement or of the royalties which have become due under the clause entitled `percentage royalty'". The original complaint pleaded only that the "defendant has paid part but not all of the license fees or royalties which have become due under the clause entitled `percentage royalties'". The contention is that the effect of this amended pleading was to inject a new and independent claim into the lawsuit not sanctioned by Rule 15(c) F.R.Civ.P., 28 U.S.C.A., and that such independent claim was barred by the six-year Colorado statute of limitations. Colo.Rev.Stat.1953, 87-1-11.
 
 
 17
 It is true, as appellants suggest, that the appellees made no specific demands for these down payments when the contracts were executed; and it is also true that throughout the correspondence between the parties concerning the appellant's arrearages under the license agreements, reference was frequently made to "back royalties". This is particularly true of appellants' correspondence. But in the appellees' correspondence demanding payment and an accounting, reference was made to "license fees". In any event, the complaints, filed within the statute of limitations, each pleaded the license agreement containing the unequivocal promise to pay the sum of $1,000.00 simultaneously with the execution of the agreement; and the prayer was for an accounting of "all unpaid license-fee and royalties due and owing from the defendants to the plaintiff under the aforesaid agreement." The appellants were thereby and thereupon given notice that they had been sued on the contracts and that is all that is required or permissible under the applicable rules of federal civil procedure. See Rule 8 F.R.C.P. Moreover, the obligation to make the down payments and the royalties grew out of the same transaction, and the amendment to specify that the down payments had not been made certainly related back to the date of the original pleading. It was not an independent claim on which the statute of limitations was applicable. Barthel v. Stamm, 5 Cir., 145 F.2d 487; United States v. Schefrin, D.C., 14 F.R.D. 462; Messelt v. Security Storage Co., D.C., 14 F.R.D. 507; United States v. C. & G. Motors, Inc., D.C., 16 F.R.D. 576.
 
 
 18
 The license agreements provided that "In any suit by licensor against licensee, to collect royalties claimed by licensor to be due under this license-agreement, licensor shall also recover (from licensee) the costs and expenses (including counsel fees) incurred by licensor in connection with the filing and prosecution of such suit, if in such suit it is decided that licensee had failed to pay royalties due under this license-agreement and that licensor is entitled to recover from licensee such unpaid royalties under this license agreement." The trial court refused to construe this provision of the contract as limiting appellees' right of recovery of litigation expenses to ordinary court costs, and found that the litigation expenses of appellees in the court cases, excluding counsel fees, totaled $3,983.57 to August 18, 1955, when the trial closed. In its final judgment, the court ordered these expenses apportioned among the appellants in accordance with the amount of royalties owing, and for which judgment was rendered. The appellants earnestly argue that the litigation expenses should be confined to statutory costs, or that the provision certainly ought to be strictly construed to exclude extraordinary expenses such as travel and subsistence of counsel and of the parties, telephone bills for long distance calls, telegrams, transportation of excess baggage, car fares, taxi fares, and other similar items. Invoking the principle of ejusdem generis, appellants argue that the parenthetical use of the phrase "including counsel fees", following "costs and expenses" indicates a disposition to limit the costs and expenses to those directly related to the litigation, such as statutory costs under 28 U.S.C.A. § 1920. We do not think the phraseology of the sentence lends itself to ejusdem generis. See 14 Words & Phrases, Ejusdem Generis, p. 191. Specific treatment in the contract certainly indicates an understanding that the successful licensor shall have more than statutory costs.
 
 
 19
 The successful appellees would have been entitled to their statutory costs without any contract for them. We think when this provision of the contract is considered in its context, it was intended to place the burden of the expense of litigation involving the royalties upon the unsuccessful appellants. The parties were undoubtedly free to contract with respect to the payment of the costs of litigation, including attorney fees, and the courts are not at liberty to disregard the contract or to say that any part of the expenses reasonably attributable to the litigation are not within the scope of the agreement.
 
 
 20
 On the question of attorney fees, the appellees introduced evidence to show that the reasonable value of the services rendered by appellees' counsel through the trial was $21,000.00. The court, however, found that the appellee was entitled to recover, as a part of its judgment, only the sum of $5,000.00 By fixing the fee at $5,000.00, the court did not assay to determine the amount that the appellees ought to pay to their attorneys for the services performed. Instead, the court's judgment in that regard was based upon an assumed discretion to fix the fees in accordance with equitable considerations, having in mind the harshness of the exactions of the contract.
 
 
 21
 The appellee-licensors have cross-appealed from that part of the judgment of the court which failed to award the attorney fees commensurate with the unchallenged proof. The contention is, in short, that the contract called for the allowance of attorney fees, the reasonableness of which is conclusively established by the proof, and the court was not authorized to disregard it, even on equitable principles. Our contracts provide for the allowance of counsel fees "incurred by licensor in connection with the filing and prosecution of such suit." As thus used, the word "incur" means to become liable. It negatives any idea of enrichment. See 20 Words & Phrases, Incur, p. 622. It follows that in no event could appellee recover attorney fees in any amount which he had not "paid or obliged himself to pay, and such payment or obligation must be actual, bona fide, and reasonable." Jones v. First National Bank of Ft. Collins, 74 Colo. 140, 219 P. 780, 781. There is no proof in this record from which it can be said that the appellee has paid or become liable to pay counsel fees in any amount.
 
 
 22
 It is of course a well established principle in this jurisdiction that the trial court is vested with broad discretion in the determination of reasonable attorney fees for services performed in litigation over which the court presided. In the exercise of that discretion, the court can proceed upon its own knowledge of the value of the services rendered, even disregarding expert testimony. Clarke v. Hot Springs Electric Light & Power Co., 10 Cir., 76 F.2d 918; City of Wewoka, Okl. v. Banker, 10 Cir., 117 F.2d 839; Wyoming Ry. Co. v. Herrington, 10 Cir., 163 F.2d 1004, 1005. Inasmuch as the case must be returned to the trial court for the determination of post trial and appellate costs, expenses and attorney fees, the trial court may at that time also determine the amount of attorney fees actually incurred and the reasonableness thereof.
 
 
 23
 In their cross-appeal, appellees suggest that they are entitled to recover interest on interest accrued as of the date of judgment. It is the general rule that "a judgment bears interest on the whole amount thereof, although such amount is made up partly of interest on the original obligation, and even though the interest is separately stated in the judgment." 47 C.J.S. Interest § 21 b. See also Butler v. Rockwell, 17 Colo. 290, 29 P. 458, 17 L.R.A. 611; Louisville & N. R. Co. v. Sloss-Sheffield Steel & Iron Co., 269 U.S. 217, 46 S.Ct. 73, 70 L.Ed. 242; McCormick on Damages, § 58, p. 230.
 
 
 24
 The judgment is Modified to allow interest on the down payments, and interest on the whole judgment from the date thereof. The cases are Remanded for determination of counsel fees and post trial appellate expenses in accordance with the views herein expressed.