**UNITED STATES of America,**
**Appellee,**

v.

**John CARDILLO, Lawrence Harris, Ralph Kaminsky, John Knapp, Louis Margolis, and Louis Piselli, Defendants-Appellants.**

**No. 365, Docket 27299.**

United States Court of Appeals
Second Circuit.

Argued June 7, 1962.

Decided April 24, 1963.

Earl J. McHugh, New York City, for John Cardillo, appellant.

Samuel D. Pressman, New York City, for Lawrence Harris, appellant.

Maurice Edelbaum, New York City, for Ralph Kaminsky, appellant.

H. Elliot Wales, New York City, for John Knapp, appellant.

Joseph P. Altier, New York City, for Louis Margolis, appellant.

Samuel A. Neuburger, New York City, (Stanley Parness, New York City, on the brief), for Louis Piselli, appellant.

Arthur I. Rosett, Asst. U. S. Atty., S. D. New York, New York City (Robert M. Morgenthau, U. S. Atty., S. D. New York, New York City, and Irving Younger, Asst. U. S. Atty., on the brief), for appellee.

Before CLARK, WATERMAN and MOORE, Circuit Judges.

LEONARD P. MOORE, Circuit Judge.

Appellants were all in some way involved in the interstate transportation and sale of furs stolen from the Zwerdling fur shop in Paterson, New Jersey. The indictment was in four counts: Piselli and Knapp were convicted on Count One of transporting stolen goods in interstate commerce, 18 U.S.C. § 2314, and on Count Two of conspiring to transport stolen goods in violation of § 2314. All appellants were convicted on Count Three of receiving goods which were moving in interstate commerce knowing the same to have been stolen, 18 U.S.C. § 2315, and on Count Four of conspiring to receive goods in violation of § 2315. Knapp was sentenced to concurrent ten-year terms on Counts One and Three and concurrent two-year terms on Counts Two and Four; the sentences on Counts Two and Four are to be served consecutively to the sentences on Counts One and Three. Piselli was sentenced to concurrent sentences of ten years on Counts One and Three and two years on Counts Two and Four. Harris and Margolis were sentenced to concurrent four-year sentences on Counts Three and Four. Cardillo received concurrent five-year sentences on Counts Three and Four. Ralph Kaminsky was sentenced to six years on Count Three and five years on Count Four, both sentences to be served concurrently.

The major part of the government's case was supplied by the testimony of Thaddeus Ohrynowicz and Max Friedman, both of whom testified to having a part in the criminal plan.

Ohrynowicz testified that Knapp approached him about taking part in a burglary in New Jersey and that, after examining several possibilities, they decided on the Zwerdling fur shop in Paterson, New Jersey. After surveying the store area on September 17, 1960, they concluded that they would need the assistance of a lock man. When they returned to New York that night, they communicated with Piselli, a lock expert, and he agreed to work with them. The following day, Sunday, September 18th, Knapp, Ohrynowicz and Piselli drove from New York City to Paterson and, after picking up tools at a garage that they had rented, they proceeded to Zwerdling's. They secured entrance to the fur shop by breaking into a dentist's office above the shop and drilling a hole through the floor into the store below. As Piselli and Ohrynowicz were leaving with the furs, on their way to join Knapp at the car, they were accosted by residents of the building who demanded to know what was in the bags that they were carrying. Piselli and Ohrynowicz fled in different directions and, in his flight, Ohrynowicz dropped the bags of furs that he was carrying. Piselli managed to meet Knapp and put the furs, which he was carrying, in the car. Knapp drove the car back to New York, Piselli and Ohrynowicz each returned to New York separately. That night, after his return from New Jersey, Ohrynowicz met Cardillo in a bar in New York and told him of the Zwerdling robbery. After a short time Knapp joined them and told them that he had left the furs in a locker at the Port Authority Bus Terminal in New York City. Knapp, Ohrynowicz and Cardillo then drove in the latter's car to the terminal and got the furs which Cardillo and Ohrynowicz took to Ohrynowicz's hotel room.

On Tuesday, September 20, 1960, Knapp told Ohrynowicz that Nicholas

Sten [1] had found a man named Lou (later identified as Margolis) who was willing to purchase the furs for $7,500. On the following day, Sten called Margolis and arranged for him to meet Ohrynowicz that day. At this meeting Margolis asked for some time to think over the purchase. They met again the following day. Margolis then agreed to take the furs but told Ohrynowicz that he could not pay for them until he sold them. On Saturday, September 24th, Ohrynowicz delivered the furs to Margolis at his place of business. On the following Tuesday Sten delivered $4,000 to Ohrynowicz who divided it, giving two-thirds to Knapp (presumably one-third was for Piselli) and keeping one-third for himself. On Friday, September 30th, Sten delivered $3,500 to Ohrynowicz who, after deducting $300 to cover the payment of $150 each to Sten and Cardillo, made the same division of the remainder.

Friedman testified that on September 20, 1960, Harris told him that he had an opportunity to buy some stolen furs, which he later stated came from the Zwerdling store in Paterson, New Jersey, and asked if Friedman could lend him some money for the purchase. About a week later, Harris told Friedman that Margolis offered him the furs for $7,500 and that he was going to meet Margolis and pick up the furs. When they met later the same day at Harris's house, Harris had the furs and asked Friedman for a loan of $5,000. Friedman then went out to obtain the $5,000. Upon his return, he gave it to Harris. Harris then said that he had to go to meet Margolis but he told Friedman to return later that evening. Friedman returned and met Harris at about ten P. M. and at about one A.M. Ralph Kaminsky arrived. Kaminsky agreed to pay $250 each for 28 of the fur pieces and the three men took the furs and put them in Kaminsky's car.

The first question to be considered is whether the assertion of the privilege against self-incrimination by Ohrynowicz and Friedman during cross-examination so limited appellants' right to cross-examine the witnesses against them that the convictions should be reversed. After having been instructed by the judge that he could refuse to answer questions if the answers would tend to incriminate him under state or federal law, Ohrynowicz refused to answer several questions by defense counsel relating to prior criminal activity unrelated to the crime at issue. Friedman was also instructed that he had a right to refuse to answer questions if the answers would incriminate him, and he refused to answer questions concerning the source (other than a "friend") of the $5,000 that he allegedly lent to Harris to finance the purchase of the furs from Margolis.

■ The right of a defendant in a federal court to confront the witnesses against him, guaranteed by the Sixth Amendment, includes the right to test the truth of those witnesses' testimony by cross-examination. Greene v. McElroy, 360 U.S. 474, 496, 79 S.Ct. 1400, 3 L.Ed.2d 1377 (1959); see In re Murchison, 349 U.S. 133, 75 S.Ct. 623, 99 L.Ed. 942 (1955); In re Oliver, 333 U. S. 257, 68 S.Ct. 499, 92 L.Ed. 682 (1941); Alford v. United States, 282 U.S. 687, 51 S.Ct. 218, 75 L.Ed. 624 (1931); Kirby v. United States, 174 U. S. 47, 19 S.Ct. 574, 43 L.Ed. 890 (1898). The importance of cross-examination in our jurisprudence has been well stated by Professor Wigmore:

> "It is beyond any doubt the greatest legal engine ever invented for the discovery of truth. However difficult it may be for the layman, the scientist, or the foreign jurist to appreciate this, its wonderful power, there has probably never been a

---

1. Sten was convicted along with the appellants in this case and filed a notice of appeal. However, he did not file an appeal or a brief or participate in the oral argument. Therefore, we have not considered the merits of his appeal and it will remain pending. This action is without prejudice to the government's right to move to dismiss the appeal for failure to prosecute.

moment's doubt upon this in the mind of a lawyer of experience." (5 Wigmore, Evidence § 1367 (3d ed. 1940))

Since the right to cross-examine is guaranteed by the Constitution, a federal conviction will be reversed if the cross-examination of government witnesses has been unreasonably limited. E. g., Alford v. United States, supra; United States v. Masino, 2 Cir. 1960, 275 F.2d 129; United States v. Lester, 2 Cir. 1957, 248 F.2d 239. However, reversal need not result from every limitation of permissible cross-examination and a witness' testimony may, in some cases, be used against a defendant, even though the witness invokes his privilege against self-incrimination during cross-examination. In determining whether the testimony of a witness who invokes the privilege against self-incrimination during cross-examination may be used against the defendant, a distinction must be drawn between cases in which the assertion of the privilege merely precludes inquiry into collateral matters which bear only on the credibility of the witness and those cases in which the assertion of the privilege prevents inquiry into matters about which the witness testified on direct examination. Where the privilege has been invoked as to purely collateral matters, there is little danger of prejudice to the defendant and, therefore, the witness's testimony may be used against him. United States v. Kravitz, 3 Cir. 1960, 281 F.2d 581; Hamer v. United States, 9 Cir. 1958, 259 F.2d 274; United States v. Toner, 3 Cir. 1949, 173 F.2d 140. On the other hand, if the witness by invoking the privilege precludes inquiry into the details of his direct testimony, there may be a substantial danger of prejudice because the defense is deprived of the right to test the truth of his direct testimony and, therefore, that witness's testimony should be stricken in whole or in part, Montgomery v. United States, 5 Cir. 1953, 203 F.2d 887; cf. United States v. Andolschek, 2 Cir. 1944, 142 F.2d 503; Stephan v. United States, 6 Cir. 1943, 133 F.2d 87; United States v. Keown, W.D.Ky.1937, 19 F.Supp. 639.

The district court was not in error in refusing to strike Ohrynowicz' testimony. After admitting to a substantial criminal record, Ohrynowicz invoked the privilege against self-incrimination when asked whether he committed other crimes in the past and whether he was guilty of certain crimes with which he was then charged in the state courts. These questions were purely collateral for they related solely to his credibility as a witness and had no relation to the subject matter of his direct examination. Since the trial court was aware of his substantial criminal record and the pendency of other criminal actions against him, the defendants were not prejudiced by Ohrynowicz' assertion of the privilege and, therefore, there was no need to strike his testimony. United States v. Kravitz, supra; Hamer v. United States, supra; United States v. Toner, supra.[2]

HARRIS and KAMINSKY

Defense counsels' motion to strike the testimony of Max Friedman because of his refusal on Fifth Amendment grounds to answer questions concerning the source of the $5,000 that he allegedly gave Harris to use for the purchase of the stolen furs presents a much more troublesome problem. Friedman's testimony comprised practically the entire case against Harris and Kaminsky. He

2. There is some question whether it was proper for the trial judge to hold that Ohrynowicz was entitled under the Fifth Amendment to refuse to answer questions if the answers would incriminate him only under state law. Compare United States v. Murdock, 284 U.S. 141, 52 S.Ct. 63, 76 L.Ed. 210 (1931), with Ullmann v. United States, 350 U.S. 422, 76 S.Ct. 497, 100 L.Ed. 511 (1956), Ballmann v. Fagin, 200 U.S. 186, 26 S.Ct. 212, 50 L.Ed. 433 (1906), and United States v. Saline Bank, 1 Pet. (26 U.S.) 100, 7 L.Ed. 69 (1828). We do not have to decide this question, however, because appellants were not prejudiced by Ohrynowicz' assertion of the privilege.

testified that Harris had told him "that he (Harris) had a chance to buy a lot of clipped [stolen] furs", that the asking price was $9,000 which he thought was too much, that "he was going to wait to see if he can get them cheaper" and asked was he [Friedman] in a position to help him by loaning him some money if he consummated the deal. Friedman testified further that he had been at Harris's house a week later on which occasion Harris told him that he had bought the furs for $7,500 and that he had asked Friedman if he had the money. Friedman said that he left and returned with $5,000 which he gave to Harris. After some cross-examination concerning his financial resources (which tended to show that he was not a man who would be expected to have a sum as large as $5,000 at hand), Friedman said that he had borrowed the money from a friend. When the defense attorneys attempted to cross-examine him further on the source of the $5,000, he invoked the privilege against self-incrimination.

Whether the witness's refusal to answer followed by the trial court's failure to strike the witness's testimony, or at least that portion thereof relating to the subject matter under inquiry, constitutes reversible error requires an analysis of the purpose of the inquiry and the role which the answer, if given, might have played in the defense. The defendants primarily affected are Harris and Kaminsky.

Kaminsky's counsel argued that if he could prove that Friedman had not borrowed the $5,000 from a friend "his [Friedman's] credibility as a witness falls". Counsel for Harris and Kamin-sky, respectively, moved to strike Friedman's entire testimony. The trial court denied the motion saying, "I make it a practice not to strike any testimony * * *".[3] Approaching the question from the "credibility" point of view, the trial judge had heard ample testimony damaging to Friedman's credibility. To the court it was "obvious he is a burglar" which comment Friedman immediately confirmed by saying, "Yes, my business is a burglar." A further attack on Friedman's credibility might well be regarded as surplusage or cumulative and the refusal to strike would have been wholly justified.

However, resolution of the question is not quite so simple. The $5,000 was to enable Harris to buy the furs. Friedman in his testimony said that he had put this amount into Harris's hands. This financial transaction was not collateral but directly related to Harris's participation in the conspiracy and to Friedman's being present on the various occasions as to which he testified against Harris and Kaminsky.

Had Friedman disclosed the name of the lender, there would have been several possibilities. The lender might not have been available as a witness, he might have confirmed the loan, he might have denied making it or the defense might have been able to introduce other proof to show that the alleged lender could not possibly have made the loan. If the proof were sufficiently convincing to induce a belief that the loan had never been made, the court's reaction to all of Friedman's testimony might have been so adverse that it would have accepted no part thereof. Disclosure of a

3. This remark may have been made in reference to the court's practice in non-jury trials in which proper weight can be given to all testimony and the relevant sifted from the irrelevant. In jury trials and, particularly, in multi-defendant cases with conspiracy counts, it is often necessary to receive testimony subject to connection or subject to a motion to strike. If not connected, or if connected only to one or more of many defendants, a motion to strike as to other defendants or instructions to disregard would appear to be in order. The effectiveness of such procedures after the testimony has been heard by the jury has been the subject of speculation, metaphysical and otherwise, by jurists and trial lawyers for generations. However, in multi-defendant trials our jury system compels reliance upon the jury's ability to follow and act upon the judge's instructions as to the applicable law and with respect to individual defendants the applicable evidence.

direct lie relating to the events testified to might have had far more influence on the court's ultimate decision than testimony merely establishing the unsavory character of the witness by admissions of prior crimes.

This is not to say that every refusal to answer by a witness, claiming his constitutional right against self-incrimination, requires the striking of his testimony or a part thereof. There would appear to be at least three categories to be considered. The first would be one in which the answer would have been so closely related to the commission of the crime that the entire testimony of the witness should be stricken. The second would be a situation in which the subject matter of the testimony was connected solely with one phase of the case in which event a partial striking might suffice. The third would involve collateral matters or cumulative testimony concerning credibility which would not require a direction to strike and which could be handled (in a jury case) by the judge's charge if questions as to the weight to be ascribed to such testimony arose. As to the first and second categories suggested, whether all or a part of the testimony should be stricken, must depend upon the discretion of the trial judge exercised in the light of the particular circumstances. Unsatisfactory as such a generality is for a trial judge who is required to give instantaneous rulings on close questions and who does not enjoy the luxury of reflective appellate deliberation, any set of specific dogmas would be even more unworkable.

In this case, despite the original claim that his proposed cross-examination related to "credibility," it was not the type of testimony that would have developed the general unsavory character of the witness as might questions dealing with prior convictions. The answers solicited might have established untruthfulness with respect to specific events of the crime charged. It is in this field that the decisions appear to call for the striking of testimony.[4] The ground given is not so much that credibility is involved but that refusal to answer thwarts a fundamental right of the defendant to cross-examine his accusers. The refusal of Friedman to answer falls into this category and for this reason the judgments of conviction against Harris and Kaminsky must be reversed. Since a new trial of these two defendants may be forthcoming, we think it wise to discuss their other contentions.

Both Harris and Kaminsky assert that the government failed to prove that the

4. In a situation such as this we might do well to recall the admonition of Mr. Justice Stone in Alford v. United States, supra, 282 U.S. at 692, 51 S.Ct. at 219:

"It is the essence of a fair trial that reasonable latitude be given the cross-examiner, even though he is unable to state to the court what facts a reasonable cross-examination might develop. Prejudice ensues from a denial of the opportunity to place the witness in his proper setting and put the weight of his testimony and his credibility to a test, without which the jury cannot fairly appraise them. * * * To say that prejudice can be established only by showing that the cross-examination, if pursued, would necessarily have brought out facts tending to discredit the testimony in chief, is to deny a substantial right and withdraw one of the safeguards essential to a fair trial."
Somewhat analogous is Montgomery v. United States, 5 Cir. 1953, 203 F.2d 887, in which the court reversed a tax-evasion conviction because the defendant, who was charged with not reporting as income money that he received as bribes, was precluded because of the witness' right not to answer questions that would incriminate him from cross-examining a government witness, who testified that he gave a bribe to the defendant, about bribes that he might have paid to others. The court said:

" 'Cross-examination of a witness is a matter of right.' Alford v. United States of America, 282 U.S. 687, 691, 51 S.Ct. 218, 219, 75 L.Ed. 624. See J. E. Hanger, Inc., v. United States, 81 U.S.App. D.C. 408, 160 F.2d 8; Jianole v. United States, 8 Cir., 299 F. 496. Indeed, cross-examination, as has been often observed, is the surest test yet devised of the truthfulness of a witness' testimony, and its allowance is especially important in the case of a witness who is himself an admitted violator of the law."

furs were "moving as, * * * a part of, or * * * constitute[d] interstate commerce" when they received them. They claim that by the time the goods reached them they were no longer in interstate commerce and, therefore, they were not guilty of a federal crime. In attempting to show that the purchases were purely intrastate transactions, they emphasize the fact that the furs had been in New York for several days before they received them and that they got the furs from Margolis who had originally received them from the thieves.

 When the original conspiracy to steal and transport goods in interstate commerce contemplates the eventual sale of the goods to an innocent purchaser, the goods continue in interstate commerce until they reach that destination and anyone who purchases the goods from one in the conspiracy knowing that they were stolen and transported in interstate commerce becomes part of the conspiracy. Roberson v. United States, 5 Cir. 1956, 237 F.2d 536; Wilkerson v. United States, 7 Cir. 1930, 41 F.2d 654; cf. Pilgrim v. United States, 5 Cir. 1959, 266 F.2d 486; Schwachter v. United States, 6 Cir. 1956, 237 F.2d 640. In such a case it is for the trier of fact to determine whether the interstate character of the transaction has been established. In this case the evidence was sufficient to support the inference that the original plan encompassed the eventual sale to an innocent purchaser and that Harris and Kaminsky had the requisite knowledge of the theft and interstate transportation.

### KNAPP

 There is no merit to Knapp's claim that there was not sufficient evidence to support his conviction. The evidence shows that he participated in the burglary, drove the stolen goods to New York, was active in the effort to obtain a purchaser for the furs, and shared in the proceeds of the sale. He claims that the part of Ohrynowicz' testimony relating to what he told Ohrynowicz was hearsay, but these statements were admissible against him as admissions and acts in furtherance of the conspiracy. 4 Wigmore, Evidence §§ 1048, 1079 (3d ed. 1940).

### PISELLI

 Piselli claims that his conviction must be reversed because the government failed to prove that he knew, when he participated in the robbery, that the furs were to be transported in interstate commerce, or that he had any part in the conspiracy to receive the stolen goods. While there is no direct evidence to show that Piselli knew of the interstate character of the theft, there is sufficient circumstantial evidence to support the conclusion that he had such knowledge. See Schwachter v. United States, 6 Cir. 1956, 237 F.2d 640, 641. He was in New York when he was first approached about taking part in the robbery; he knew that the robbery was to take place in New Jersey; he drove from New York to New Jersey with the other participants in the crime the morning of the robbery; he started back with Knapp but left the car to look for Ohrynowicz and not finding him returned directly to New York after the robbery. Since there was sufficient evidence to sustain Piselli's conviction on the illegal transportation counts, we need not consider whether there was sufficient evidence to sustain his conviction on the receiving counts because all the sentences are concurrent. Lawn v. United States, 355 U.S. 339, 362, 78 S.Ct. 311, 2 L.Ed.2d 321 (1958); United States v. Mont, 2 Cir. 1962, 306 F.2d 412.

### CARDILLO

 The evidence against Cardillo is sufficient to support his conviction. He accompanied Knapp and Ohrynowicz to the Port Authority Terminal to pick up the furs; he attempted to find a buyer for the furs; and he shared in the proceeds of their sale.

Cardillo requested that we examine certain statements by government witnesses that were not turned over to the defense pursuant to their request under 18 U.S.C. § 3500, but which were pre-

sented to the court for in-camera inspection. We have examined these statements and find that the defense was not entitled to their production.

To avoid any confusion as to the materials from the prosecutor's files which were given or shown to defendants' counsel during the trial, on January 21, 1963, by an order to supplement the record, we requested the trial judge to indicate which of the papers in the envelope sealed during the trial (a) were admitted in evidence at the trial; (b) were delivered to defense counsel for examination before or during the trial; and (c) by order of the court were not shown to the defense during the trial, Judge Murphy promptly reported on January 30, 1963. His report lists (A) transcript of grand jury testimony and F.B.I. reports and statements (17 exhibits in all) given to defense counsel during the trial; (B) F.B.I. reports, statements and certain handwritten material which were marked for identification but not given to counsel for any of the defendants on the ground that they did not come within the purview of section 3500 of Title 18 U.S.C., were seen only by the Court and ordered to be sealed, some of which singly or collectively were marked as Court's exhibits.

To determine whether there was reversible error in the trial judge's rulings with respect to the material in category B, this court has examined all the papers.

 It is, of course, settled that if the defense is entitled to production of a statement, "it is not for us to speculate whether they could have been utilized effectively." Clancy v. United States, 365 U.S. 312, 316, 81 S.Ct. 645, 648, 5 L.Ed.2d 574 (1961). The question before us, however, is whether the statement in question "related to" the direct testimony of the witness. The statement must relate generally to the events and activities testified to. Jencks v. United States, 353 U.S. 657, 77 S.Ct. 1007, 1

L.Ed.2d 1103 (1957); Ogden v. United States, 303 F.2d 724 (9th Cir. 1962). Thus, if the statement deals only with the witness's general background and personal history and does not deal with the events and activities testified to on direct examination, it is not producible under the Act. Ogden v. United States, supra. In United States v. Simmons, 281 F.2d 354 (2d Cir. 1960), a prosecution for bank robbery, we approved the action of a trial judge in withholding from defense counsel a statement of a bank officer reciting that he had not packaged any twenty dollar bills immediately prior to the robbery and that as a rule he did not handle or package money in the course of his duties, as the statement did not relate to the subject matter of the witness's testimony on direct examination as he had testified only to the events on the day of the robbery. Statements that did relate to Ohrynowicz's testimony at trial, those describing the preparation for and perpetration of the crime and the efforts to dispose of the furs, were turned over to the defense. The defense was given two lengthy reports of statements by Ohrynowicz to the F.B.I. and Ohrynowicz's Grand Jury testimony.

The statements which were not turned over related primarily to a loan made by Ohrynowicz to Sten, who is not before us on this appeal and to Ohrynowicz's activities during the summer of 1960, namely, in June, July and August, prior to the September 18th robbery. The statements do not deal with testimony adduced from Government witnesses on direct examination which affects the appellants herein.[5] They concern themselves largely with Ohrynowicz's source of income during the summer which he claimed was shoplifting.

In view of the large amount of material turned over by the prosecution to defense counsel, including Ohrynowicz's statements dealing with his planning of, and participating in, the crime in ques-

---

5. Although Cardillo was the only one of the appellants who requested that we examine these statements, we have determined

that none of the appellants were entitled to receive these statements.

tion, there was no error in the exercise of the trial court's judgment in not turning over collateral matter which did not relate to the events and activities testified to by the witness. The trial judge was in a position to grasp the significance of the testimony of the government witnesses and was in the best position to determine which reports and statements related to their testimony and which were incidental or collateral. His decision is not to be overturned unless clearly erroneous. Palermo v. United States, 360 U.S. 343, 79 S.Ct. 1217, 3 L.Ed.2d 1287 (1957); Hance v. United States, 299 F.2d 389 (8th Cir., 1962).

 As to the reports or statements of Agent Bergholtz, his testimony occupies four-and-one-half pages of the record. He stated that he and other agents arrested Sten on October 20, 1960, and that a search of Sten's residence at that time uncovered a card with Ohrynowicz's address written on it. His testimony related to no other defendant. It is inconceivable that any other defendant could have had the slightest interest in impeaching Bergholtz with respect to the details of his arrest of Sten.

In our opinion, the decision of the trial court that the documents in question were not within the purview of section 3500 was not clearly erroneous. This conclusion is supported by our own independent examination of the same documents.

MARGOLIS

 Margolis' conviction is supported by testimony other than that of Friedman. His claim that his conviction of conspiracy cannot stand because the government failed to prove that he had knowledge of the interstate shipment of the furs is not well founded because such knowledge is not necessary to sustain a conviction on the ground of receiving stolen goods which are moving in interstate commerce. 18 U.S.C. § 2315. Since Margolis' sentence on the conspiracy count is concurrent with the sentence on the receiving count, the judgment below can be sustained, even if the conspiracy conviction was improper. Lawn v. United States, supra; United States v. Mont, supra. There is no merit in Margolis' claim that the fact that government agents spoke to him on two different occasions after he was indicted and on one occasion between the time of arrest and indictment in the absence of his counsel requires reversal of his conviction. The government did not introduce any statements made during these interviews and the agents' actions did not interfere with Margolis' right to counsel.

The judgments of conviction of Harris and Kaminsky are reversed; the judgments of conviction of all other appellants are affirmed.

CLARK, Circuit Judge (concurring in the result).

We seem generally unwilling to upset convictions when the Jencks Act, 18 U. S.C. § 3500, has not been scrupulously observed by the prosecution and the trial court. This tendency is disturbing. Several doctrinal devices have been developed to this end, such as that enunciated in United States v. Annunziato, 2 Cir., 293 F.2d 373, 382, cert. denied Annunziato v. United States, 368 U.S. 919, 82 S.Ct. 240, 7 L.Ed.2d 134, that it is only "harmless error" not to produce a statement which appears to "corroborate" a witness's testimony, or in United States v. Simmons, 2 Cir., 281 F.2d 354, 357–358, and the present case that the defense is not entitled to statements relating to purely incidental or collateral aspects of a witness's testimony, or in United States v. Aviles, 2 Cir., 315 F.2d 186, that the defense is not entitled to statements not sufficiently exact, though to the district judge "probably verbatim," recitals of the witness's oral statements. By employing one or more of these doctrinal devices the court is enabled to affirm an appealed conviction. Nevertheless this means that the speculation of the trial court is again being substituted for the judgment of defense counsel in assessing a statement's worth as an aid to cross-examination. It is

this very evil which the Supreme Court has continually repudiated. See Scales v. United States, 367 U.S. 203, 258, 81 S. Ct. 1469, 6 L.Ed.2d 782; Palermo v. United States, 360 U.S. 343, 346, 79 S.Ct. 1217, 3 L.Ed.2d 1287; Jencks v. United States, 353 U.S. 657, 668–669, 77 S.Ct. 1007, 1 L.Ed.2d 1103. But these doctrinal devices for achieving affirmance in the face of Jencks Act noncompliances are sufficiently entrenched that exception should not be made in individual cases and correction must come from the Supreme Court. Thus I reluctantly concur in the affirmances here noted. I concur in the reversals of the Harris and Kaminsky convictions and in the opinion so far as it relates to these matters.