## UNITED STATES, Appellee

v.

## HIRAM A. COLON-ATIENZA, Specialist Four, U. S. Army, Appellant

No. 26,674

July 6, 1973

*Captain George Clyde Gray* argued the cause for Appellant, Accused. With him on the brief were *Colonel Arnold I. Melnick* and *Captain Gilbert J. Weller.*

*Captain John T. Steger* argued the cause for Appellee, United States. With him on the brief were *Lieutenant Colonel Ronald M. Holdaway, Major Thomas P. Burns, III, Captain Richard L. Menson,* and *Captain Glenn R. Bonard.*

### OPINION OF THE COURT

QUINN, Judge:

On testimony by PFC Schuette that he had purchased a packet of heroin from the accused, in a barracks of the 414th Signal Company at Fort Meade, the accused was convicted of wrongful possession and sale of heroin. During cross-examination by defense counsel, Schuette, on the advice of his own lawyer, refused to answer a number of questions on the ground of self-incrimination. A defense motion to compel Schuette to answer or to strike his testimony was denied by the trial judge. The accused challenges the correctness of that ruling.

Appellate government counsel concede that included in the accused's right to confront an adverse witness is the right to cross-examine him. See *In re* Oliver, 333 US 257 (1948); Manual for Courts-Martial, United States, 1969 (Rev. ed.), paragraph 149*b*. They also concede that unreasonable limitation of cross-examination may amount to reversible error. Alford v United States, 282 US 687 (1931); United States v Greene, 21 USCMA 543, 45 CMR 317 (1972). However, they contend that "in both content and purpose," all questions Schuette refused to answer constituted only "attempted attacks on . . . [his] credibility." Relying upon United States v Cardillo, 316 F. 2d 606 (2d Cir. 1963), *cert. denied,* 375 US 822 (1963), they maintain that

an attack on the credibility of the witness is a collateral matter in regard to which the witness' assertion of the right against self-incrimination presents, in the language of *Cardillo,* 316 F. 2d at 611, "little danger of prejudice to the defendant," as distinguished from invocation of the right in connection with questions dealing with "the details of his direct testimony."

The view we take of the import of the cross-examination of Schuette makes it unnecessary to consider whether government counsel correctly interpret *Cardillo* as holding that inquiry into the credibility of a vital government witness is a "purely collateral" matter. Suffice it to note that other federal appellate courts have held that the trial judge's refusal to strike the testimony of a material government witness who refuses to answer defense questions calculated to impeach his credibility can constitute prejudicial limitation of the accused's right to cross-examine the witness. See United States v Fowler, 465 F2d 664 (DC Cir 1972); Montgomery v United States, 203 F2d 887 (5th Cir 1953). We are satisfied that some of the questions asked Schuette went to the core of his direct testimony and were crucial to the merits.

Schuette testified that he received a marked $20 bill from Captain Spruill, the company commander, to buy heroin from the accused. Schuette's association with the captain in regard to drug-use curtailment began several months earlier when Schuette turned himself in, in response to an exhortation by Captain Spruill to company personnel to disclose their involvement with drugs and be helped to terminate the connection or face "plenty of trouble" if caught. Schuette was the only one to respond to the invitation and he was, as described by Captain Spruill, "scared out of his pants." According to Article 32 testimony which was acknowledged at trial, Captain Spruill promised Schuette that he would transfer him, as he desired, if information provided by him as to drug use in the company "panned out."

Spruill gave Schuette the marked money on Sunday morning, December 6. Apparently, he anticipated there might be some "slippage" on Schuette's part because he cautioned him "to make sure" that the bill was not used for any purpose but the purchase of narcotics from the accused, but if it was so used, Schuette was to let the captain know. The next morning, Captain Spruill saw Schuette in the orderly room. The accused was also present. Spruill asked Schuette if he still had "the bill" and Schuette assured him that he did. When the accused left, he told Schuette "to go out and see if he could make a purchase from him." Schuette also left. About 15 to 30 minutes later, he returned. According to Captain Spruill, he looked "flustered." He "handed" the captain a small tinfoil package, saying "this is it." Captain Spruill was "fairly familiar" with various types of narcotics and their packaging. Apparently, he was surprised by the small size of the packet he received from Schuette. Based on an apparently standard "cut" of 6 percent, he expected a packet about twice the size, or "maybe a little larger," of the one he received. He remarked that it was "an awful small amount for twenty bucks." Schuette's response was: "[W]ell this is the pure stuff." Shortly thereafter, the accused was searched, and the marked $20 bill was found in his possession.

One theory of defense that emerged from the cross-examination of government witnesses was that the packet of heroin allegedly obtained from the accused actually belonged to Schuette. To develop the theory further, Schuette was asked a number of questions dealing with his own use and sources of supply of narcotics. The material questions and Schuette's responses are as follows:

Q. Where were you able to get the money to purchase narcotics?
A. I refuse to make a statement.

Q. How big of a narcotic habit did you have, sir?
A. I refuse to make a statement.

Q. Isn't it true that you would have done anything at this point to get money to purchase narcotics?
A. I refuse to make a statement.

.  .  .  .  .

Q. You made a purchase the day before didn't you?

A. Yes, sir.

Q. Who did you make the purchase from the day before?
A. I refuse to make a statement.

Q. How much of a purchase did you make the day before?
A. I refuse to make a statement.

Q. How many different people did you purchase narcotics from?
A. I refuse to make a statement.

Q. How long have you been purchasing these narcotics?
A. I refuse to make a statement.

Q. You knew most of the people on the Fort Meade property that were using narcotics, did you not?
A. I refuse to make a statement.

.     .     .     .     .

Q. Now, you have been going up to New York regularly around this time to get narcotics in New York, were you not?
A. I refuse to make a statement.

In the *Cardillo* case, supra, the defendant was charged with interstate transportation and sale of stolen furs. A government witness, whose testimony "comprised practically the entire case" against defendants, Harris and Kaminsky, testified that he had lent Harris $5,000 for the purpose of buying the stolen furs for resale to Kaminsky. The witness admitted that his financial resources were such that he was not a "man who would be expected" to have $5,000 at hand. During cross-examination, he refused, on the ground of self-incrimination, to answer questions as to the source of the $5,000 he allegedly gave Harris. A defense motion to strike his testimony was denied. The Court of Appeals held that the ruling constituted prejudicial error as to Harris and Kaminsky. In part, the court said, 316 F2d at 612-613:

The $5,000 was to enable Harris to buy the furs. Friedman [the witness] in his testimony said that he had put this amount into Harris's hands. This financial transaction was not collateral but directly related to Harris's participation in the conspiracy and to Friedman's being present on the various occasions as to which he testified against Harris and Kaminsky.

Had Friedman disclosed the name of the lender, there would have been several possibilities. The lender might not have been available as a witness, he might have confirmed the loan, he might have denied making it or the defense might have been able to introduce other proof to show that the alleged lender could not possibly have made the loan. If the proof were sufficiently convincing to induce a belief that the loan had never been made, the court's reaction to all of Friedman's testimony might have been so adverse that it would have accepted no part thereof. Disclosure of a direct lie relating to the events testified to might have had far more influence on the court's ultimate decision than testimony merely establishing the unsavory character of the witness by admissions of prior crimes.

Here, as in *Cardillo,* the questions which Schuette refused to answer did not pertain exclusively to previous or current misconduct with drugs. If Schuette had purchased heroin the day before the alleged buy from the accused, further inquiry might have confirmed that the amount he bought and what he did with it were so consistent with the "awful small amount" turned over to Captain Spruill as to support a conclusion that what he gave the captain was the remainder of that purchase, not what he purported to receive from the accused. Additionally, if Schuette had admitted that he had inadequate funds to buy the drugs he needed and that he would have done "anything at this point" to satisfy his habit, those admissions would have tended to support the defense theory that his transaction with the accused was not as he claimed it to be. They would also suggest that Schuette's "flustered" appearance when he reported to Captain Spruill was more the result of his distortion of the nature of the transaction than participation in a drug transaction that was, for him, a regular and commonplace matter.

In Montgomery v United States, supra, the defendant, a county sheriff, was charged with attempting to evade in-

come taxes. A government witness testified that, at various times, he had given bribes to the defendant. As sheriff, the defendant was one of several state and local officials responsible for law enforcement in the area. On cross-examination, the witness was asked to name other enforcement officers in the area to whom he had given bribes during the period in issue. Defense counsel explained that the purpose of this line of inquiry was to determine how the sheriff could protect the witness from action by "all the others." The trial judge refused to allow the inquiry. On appeal, the Court of Appeals held that the judge's ruling prejudicially restricted the defendant's right of cross-examination. The situation in this case is similar. If Schuette knew most of the people at Fort Meade involved in drugs and regularly purchased his own requirements from persons available to him, the ease with which he allegedly made a purchase from the accused, although he had apparently never previously dealt with him, would, as in *Montgomery*, draw in question not only his credibility, but whether his transaction with the accused actually took place. As Agent Robinson, chief of the drug investigation division of the criminal investigation detachment, testified: "[P]eople dealing in this thing . . . will not sell to people that are totally unknown to them."

In our opinion, the trial judge erred in denying the defense motion to strike Schuette's testimony. Schuette's assertion of the privilege against self-incrimination precluded the defense from properly cross-examining him on matters material to the merits.

The decision of the Court of Military Review is reversed and the findings of guilty and the sentence are set aside. A rehearing may be ordered.

Chief Judge DARDEN and Judge DUNCAN concur.