STATE OF NORTH CAROLINA v. JERMAINE RAY

No. 75A93

(Filed 17 June 1994)

**Constitutional Law §§ 349, 354 (NCI4th)— cross-examination— privilege against self-incrimination partially invoked—no prejudicial error**

There was no prejudicial error in a first-degree murder prosecution where a State's witness who had been present at the murder was allowed to describe the murder but invoke the Fifth Amendment testimonial privilege in response to questions on cross-examination concerning his drug dealing. Drug dealing was more than a collateral matter that went only to the credibility of this witness and the trial court should have either required the witness to answer questions or have stricken

STATE v. RAY

[336 N.C. 463 (1994)]

all or part of his direct testimony after allowing him to assert the privilege. There was no prejudice, however, because defendant was able to get his contentions before the jury.

**Am Jur 2d, Criminal Law §§ 937, 998.**

**Propriety of court's failure or refusal to strike direct testimony of government witness who refuses, on grounds of self-incrimination, to answer questions on cross-examination. 55 ALR Fed. 742.**

Appeal of right pursuant to N.C.G.S. § 7A-27(a) from a judgment imposing a sentence of life imprisonment entered by Ellis, J., at the 31 August 1992 Session of Superior Court, Cumberland County, upon a jury verdict of guilty of murder in the first degree. Heard in the Supreme Court 17 November 1993.

*Michael F. Easley, Attorney General, by Dennis P. Myers, Assistant Attorney General, for the State.*

*Malcolm Ray Hunter, Jr., Appellate Defender, by Staples Hughes, Assistant Appellate Defender, for defendant-appellant.*

FRYE, Justice.

On 3 June 1991, defendant was indicted for the first-degree murder of Jermaine McNeil. In a capital trial the jury found defendant guilty of first-degree murder. Following a capital sentencing proceeding the jury recommended, and the trial court imposed, a sentence of life imprisonment.

Defendant raises on appeal a single issue based on two assignments of error. After a thorough review of the trial transcript, record on appeal, written briefs, and oral arguments, we conclude that defendant received a fair trial, free of prejudicial error.

The State presented evidence tending to show the following: Shortly before 8:00 p.m. on 16 November 1990, Alonzo Gallaway drove into the woods near a washerette on Murchison Road in Fayetteville to relieve himself. He saw a body, later identified as Jermaine McNeil, lying on the ground with blood around its face and head. Gallaway drove to a convenience store and called the police.

Officer Jeffrey Stafford responded to the call and thereafter acted as lead investigator on the case. During the course of the investigation, Stafford received information that Demetrius Hawkins might have been involved in the murder and he contacted Lorene Downing, Hawkins' aunt. Downing gave Stafford a statement to the effect that on the night of 16 November 1990, Hawkins had told her he "saw someone get killed." Stafford interviewed Hawkins who identified defendant as the person who shot and killed Jermaine McNeil. In his statement Hawkins stated that he, McNeil and defendant were walking near the washerette on Murchison Road when defendant shot McNeil. Defendant then tried to give the gun to Hawkins and told him that he had to shoot McNeil also, but Hawkins refused. Defendant then shot McNeil "a lot" of times.

Demetrius Hawkins testified that "Maine" was the nickname for the decedent. Hawkins then gave evasive or unresponsive answers and was asked by the prosecutor if he would like to confer with his attorney which he did. Thereafter, Hawkins testified that defendant (also known as "Stonewall") asked him and McNeil to walk over to his house with him. As they were walking behind the washerette, Hawkins heard shots fired. McNeil fell, saying "Stonewall, man you shot me." Defendant told McNeil to shut up and kept firing at him. Defendant had a black .357 magnum revolver. He tried to give Hawkins the gun, telling him that they were in it together. When Hawkins refused, defendant called him a "punk," reloaded the gun, and continued shooting McNeil. Hawkins testified that he believed defendant shot McNeil twelve times, reloading twice in the process. Hawkins testified that no one else was present during the shooting.

Hawkins stated that after the shooting he walked to defendant's house with him and then called a cab and went back to his aunt's house. He described telling Lorene Downing about the shooting, consistent with her testimony and that of Officer Stafford. Hawkins testified that defendant's girlfriend was the mother of McNeil's child and that defendant and McNeil had argued two weeks before the shooting about buying diapers for the child. Hawkins denied having anything to do with the shooting or any plan to lure McNeil to the point where he was shot. He also denied any knowledge that defendant had a gun prior to the shooting.

Hawkins further testified that he was charged with accessory after the fact of first-degree murder in the shooting of Jermaine

STATE v. RAY

[336 N.C. 463 (1994)]

McNeil. He described his plea bargain with the State which provided that the accessory charge would be dropped in exchange for his testimony. Hawkins also testified that he had several drug-related charges pending, which were not affected by the plea bargain.

Lorene Downing testified that on 16 November 1990 she was temporarily staying at the house where Hawkins lived with another one of his aunts. At about 8:00 p.m., Hawkins woke her up and said he had to tell her something. He appeared nervous, upset and scared. He told her that he had seen a shooting and that he did not have anything to do with it. He said that he, "Maine," and another person were walking behind the laundromat when the third person shot "Maine" in the back. Downing testified that Hawkins told her, "they had tricked him back there to see some girls or something like that and shot him." The shooter tried to give the gun to Hawkins, but Hawkins would not take it. The shooter then began to shoot "Maine" again. Downing testified that Hawkins told her that the shooting did not have anything to do with drugs, but had to do with a girl. Hawkins refused to tell Downing who had done the shooting. Downing further testified that Hawkins said he was afraid to go to the police because "he would get shot, or they would kill him."

Autopsy results revealed that McNeil had been shot twelve times, six times in the head, five times in the chest and abdomen and once in the right buttock. The shot in the buttock was not fatal, but broke his leg and disabled him, after which the other shots were inflicted. McNeil died from these multiple gunshots, six of which inflicted lethal wounds.

Defendant presented no evidence.

Defendant assigns as error the trial court's failure to strike the testimony of the State's key witness, Demetrius Hawkins, who was permitted to assert his Fifth Amendment testimonial privilege in response to certain questions on cross-examination.

Demetrius Hawkins was the first witness called by the State. He was initially uncooperative, stating that he did not know or did not recall anything about the shooting of Jermaine McNeil. He eventually stated that responding to the prosecutor's questions might incriminate him. A fifteen-minute recess was taken during which time Hawkins conferred with his attorney who had accompanied him to court. Hawkins then testified that he witnessed defendant shoot Jermaine McNeil.

## STATE v. RAY

[336 N.C. 463 (1994)]

During direct examination of Hawkins the issue of drug dealing was raised. Hawkins was asked what he was doing to make a living at the time he met the victim and defendant and was specifically asked whether he was selling drugs. He was also asked whether he was holding any drugs at the time of the shooting. Hawkins testified that he was not working nor selling drugs when he met the victim and defendant and that he was not holding drugs at the time of the shooting. The prosecutor also posed questions about the involvement of other people in drug sales. He asked if Hawkins knew what McNeil was doing to make money. Over an objection which was later sustained, Hawkins answered that McNeil was selling drugs. When asked if he had personal knowledge that McNeil sold drugs, Hawkins said he did not. Hawkins was then asked if he had ever seen McNeil selling drugs or been around him when he was selling drugs or holding drugs for someone else. Hawkins responded that he had never seen McNeil selling drugs or been around him when he was selling and that he did not know if he had ever been around McNeil when McNeil was holding drugs for someone else. Hawkins was also asked if he remembered whether his aunt asked him if the shooting was about drugs and he testified that he didn't remember.

The prosecutor further inquired whether Hawkins knew someone named Sammy Ray Jones, also known as "Sammy D"; whether Hawkins knew what Sammy D did for a living; and whether he worked for Sammy D. Hawkins testified that he knew Sammy D, knew what Sammy D did for a living, but that he did not work for Sammy D. Following a hearsay objection by defendant, Hawkins was not allowed to state what Sammy D's occupation was. Hawkins was asked if he saw Sammy D on the day of the shooting and if he had any contact with Sammy D or Sammy D's mother since he (Hawkins) had been in jail. Hawkins testified that he did not see Sammy D at any time on the day of the shooting, nor had he had any contact with Sammy D since the shooting. Hawkins testified that he knew Sammy D's mother and pointed her out as she sat in the courtroom; he had not had any contact with her since he had been in jail.

On cross-examination, Hawkins testified that he sold drugs. He specifically testified that during the summer of 1990 he and a group of other people sold drugs in the Preston Avenue area of Cumberland County. Hawkins refused to answer other questions about the drug trade, asserting that the responses might incriminate

him. He refused to identify the source of his drugs; refused to say whether the victim sold drugs; refused to reveal the identity of the person to whom he took the proceeds of his drug sales; refused to say whether the person he took the proceeds to had a relative seated in the courtroom, apparently a reference to Sammy D's mother; and refused to say whether everyone working in the Preston Avenue area was working for Sammy D.

On redirect examination, Hawkins refused to say whether the victim was selling drugs, but did testify that defendant was selling drugs and that defendant was not working for the same person for whom Hawkins was working. Hawkins refused to say whether the victim and defendant were selling drugs on the day of the shooting. At the conclusion of Hawkins' testimony, defendant addressed the court outside the presence of the jury requesting that the witness be required to answer questions to which he had invoked the testimonial privilege or that the court strike his testimony. Defendant's motion was denied.

Defendant contends that allowing Hawkins to assert the testimonial privilege in response to these questions significantly impaired defendant's ability to test the truth of Hawkins' testimony. Thus, according to defendant, the trial court's failure either to require Hawkins to answer the questions or to strike his direct examination testimony was error requiring a new trial.

Under the Sixth Amendment to the United States Constitution and Article I, § 23 of the North Carolina Constitution, a criminal defendant has the right to confront witnesses against him. "The right of a defendant . . . to confront the witnesses against him, guaranteed by the Sixth Amendment, includes the right to test the truth of those witnesses' testimony by cross-examination." *United States v. Cardillo*, 316 F.2d 606, 610 (2d Cir.), *cert. denied*, 375 U.S. 822, 11 L. Ed. 2d 55 (1963). "This Court has repeatedly held that the right to confront is an affirmance of the rule of the common law that in criminal trials by jury the witness must not only be present, but must be subject to cross-examination under oath." *State v. Perry*, 210 N.C. 796, 797, 188 S.E. 639, 640 (1936).

Under the Fifth Amendment to the United States Constitution and Article I, § 23 of the North Carolina Constitution, a witness cannot be compelled to give self-incriminating evidence. "When the individual invokes the fifth amendment privilege, the trial court must determine whether the question is such that it may reasonably

STATE v. RAY

[336 N.C. 463 (1994)]

be inferred that the answer may be self-incriminating." *State v. Eason*, 328 N.C. 409, 418, 402 S.E.2d 809, 813 (1991). Here, Hawkins testified that at the time of his testimony he was charged with the manufacture, sale and delivery of drugs in three different cases. Defendant questions whether Hawkins had a testimonial privilege to assert with regard to the questions asked in light of the fact that he admitted that he sold drugs and knew other drug dealers in the area. The State argues that the source of Hawkins' drugs and the identity of the person to whom Hawkins took the proceeds of his drug sales were matters directly related to the knowledge and intent elements of the charged crimes and, thus, Hawkins was properly allowed to assert the testimonial privilege. The trial court found that some of the answers to cross-examination questions could be incriminating and that Hawkins had a right to refuse to answer those questions. As this question is not raised on appeal, we do not consider whether the witness was properly allowed to assert the testimonial privilege.

The issue thus becomes whether defendant's right to confront witnesses through cross-examination was unreasonably limited by Hawkins' assertion of the testimonial privilege.

In *State v. Perry,* this Court examined the situation in which a defendant's right to confrontation and a witness' right against self-incrimination were in conflict. *Perry,* 210 N.C. at 797-98, 188 S.E. at 640. In *Perry,* the defendant and the witness were both indicted for the same murder. In defendant's separate trial, the witness testified for the State that he and the defendant were together on the night of the homicide, but that they separated for about an hour and a half. When they rejoined, the defendant told the witness that he (defendant) had killed the victim. On cross-examination, the defendant asked the witness if he owned a gun, where he kept it, and where he was during the time he and the defendant separated. The witness refused to answer these questions, asserting the testimonial privilege.

The Court held that the trial court erred by failing to strike the witness' testimony while allowing him to assert the testimonial privilege on cross-examination. The Court stated that while the witness could not be compelled to give testimony that would incriminate him,

it is part of the express or implied understanding that an accomplice admitted to testify for the prosecution shall tell

all he knows, . . . and he cannot refuse to answer a relevant
question on cross-examination under the rule that he shall
not incriminate himself . . . . In other words, an accomplice
will not be permitted to disclose part of the facts and withhold
the rest. He must tell the whole. The cross-examination of
a witness is a right and not a mere privilege, . . . and any
subject touched on in the examination-in-chief is open to
cross-examination.

*Perry,* 210 N.C. at 797-98, 188 S.E. at 640 (citations omitted).

Similarly, under federal law it has been stated:

In determining whether the testimony of a witness who in-
vokes the privilege against self-incrimination during cross-
examination may be used against the defendant, a distinction
must be drawn between cases in which the assertion of the
privilege merely precludes inquiry into collateral matters which
bear only on the credibility of the witness and those cases
in which the assertion of the privilege prevents inquiry into
matters about which the witness testified on direct examination.

*Cardillo,* 316 F.2d at 611. If the witness invokes the privilege in
response to questions regarding collateral matters, there is little
danger of prejudice, but if the questions relate to the details of
the direct examination, "there may be a substantial danger of preju-
dice because the defense is deprived of the right to test the truth
of [the] direct testimony and, therefore, that witness's testimony
should be stricken in whole or in part." *Id. See also United States
v. Smith,* 342 F.2d 525 (4th Cir.), *cert. denied,* 381 U.S. 913, 14
L. Ed. 2d 434 (1965); *Lawson v. Murray,* 837 F.2d 653 (4th Cir.),
*cert. denied,* 488 U.S. 831, 102 L. Ed. 2d 63 (1988) (the same principle
applies to defense witnesses so that, "[t]he defendant's right to
present witnesses in his own defense . . . does not carry with
it the right to immunize the witness from reasonable and appropriate
cross-examination.").

In *Cardillo,* the witness testified for the prosecution and, on
direct examination, described the activities of himself, the defend-
ant and others who were involved in the interstate transportation
and sale of stolen furs. The witness invoked the testimonial privilege
when asked whether he had committed other crimes in the past
and whether he was guilty of certain crimes with which he was
then charged. The court found that "[t]hese questions were purely

collateral for they related solely to [the witness'] credibility . . . and had no relation to the subject matter of his direct examination." *Cardillo*, 316 F.2d at 611.

A second witness in *Cardillo* testified that the defendant approached him about having an opportunity to purchase some stolen furs and asked to borrow some money. The witness testified that he gave the defendant $5,000 which the defendant used to purchase the stolen furs. After cross-examination revealed that the witness was not likely to have had $5,000 on hand, defense attorneys attempted to cross-examine him further on the source of the $5,000, but he refused to answer, invoking the privilege against self-incrimination. In determining whether the failure to strike the witness' testimony was reversible error, the court analyzed "the purpose of the inquiry and the role which the answer, if given, might have played in the defense." *Id.* at 612. The court concluded that if the questions had been posed in order to attack credibility, the answer would have been surplusage or cumulative, based on other testimony, and the refusal to strike would have been justified. However, on the *Cardillo* facts, the financial transaction was not collateral but directly related to the defendant's alleged criminal activities and to the witness' presence on the various occasions to which he testified. "The answers solicited might have established untruthfulness with respect to specific events of the crime charged," and under these circumstances the testimony should have been stricken. *Id.* at 613.

In applying the test set forth in *Cardillo*, courts have found that drawing the distinction between direct and collateral matters is often difficult. However, the essential question "must finally be whether defendant's inability to make the inquiry created a substantial danger of prejudice by depriving him of the ability to test the truth of the witness' direct testimony." *United States v. Rogers*, 475 F.2d 821, 827 (7th Cir. 1973) (quoting *Fountain v. United States*, 384 F.2d 624, 628 (5th Cir.), *cert. denied*, 390 U.S. 1005, 20 L. Ed. 2d 105 (1968)).

In the instant case, drug dealing was more than a collateral matter that went only to the credibility of this witness. The direct examination testimony of Hawkins reflects that drug dealing was the basis of the relationship between the victim, defendant, and the witness, and it was the probable reason that the three were on Preston Avenue on the evening of the murder. The role of

drug dealing in the activities of the victim, defendant, the witness, and possible other parties was explored at some length by the prosecutor on direct examination of its witness, Demetrius Hawkins. Through this testimony the jury was told that the three men sold drugs, that they did so in the area of Preston Avenue where this homicide occurred, and that other persons were involved in the drug trade in this area, including a person named Sammy D, whose mother was a friend of the witness and was present in the courtroom but was not a witness for the State or defendant. It was reasonable to infer from Hawkins' testimony that Sammy D was an employer in the drug trade and that one or more of the three men present at the shooting worked for Sammy D. In fact, Hawkins' aunt testified that she had overheard Hawkins previously refer to working for Sammy D and, based on things she had heard Hawkins say around the house, she initially assumed that Sammy D was the assailant.

Thus, the issue of drug dealing among the victim, defendant, the witness and possibly others, as well as the role drug dealing may have played in this homicide, was raised and addressed during the direct examination of Hawkins. This is not a case "in which the assertion of the privilege merely preclude[d] inquiry into collateral matters which [bore] only on the credibility of the witness." *Cardillo*, 316 F.2d at 611. Rather, "the assertion of the privilege prevent[ed] inquiry into matters about which the witness testified on direct examination." *Id.* By asserting the testimonial privilege in response to selected questions on cross-examination, Hawkins attempted to "disclose part of the facts and withhold the rest." *Perry*, 210 N.C. at 798, 188 S.E. at 640. This, under the law, he cannot do. The trial court should have either required Hawkins to answer the questions, or stricken all or part of his direct testimony after allowing him to assert the testimonial privilege. Having allowed Hawkins to assert the testimonial privilege, the failure of the trial court to strike all or part of his direct testimony was error. Nevertheless, under the particular facts of this case, we conclude that the error was harmless beyond a reasonable doubt. N.C.G.S. § 15A-1443(b) (1988).

Defendant apparently wanted to show that the witness, the victim and defendant were involved in the drug trade and that one or more of them worked for a person named Sammy D, who was also involved in the drug trade. The witness did indeed testify that he and defendant sold drugs. He also testified, over a defense

objection which was later sustained, that the victim sold drugs. The witness answered a number of questions regarding whether each of the young men worked for Sammy D. Hawkins testified that he did not work for Sammy D; that he did not know if the victim worked for Sammy D or if the victim worked for the same person Hawkins worked for; and that he did not know who defendant was working for, but that he was not working for the same person Hawkins was working for. Although he testified that he knew Sammy D and knew what Sammy D did for a living, following a hearsay objection by defendant, Hawkins was not allowed to state what Sammy D's occupation was. We also note that through his cross-examination of Hawkins' aunt, Lorene Downing, defendant elicited testimony that Hawkins did work for Sammy D. Defendant was thus able to get his contentions before the jury except when he objected to part of them. We accordingly find no prejudicial error in defendant's trial.

NO ERROR.