An unpublished opinion of the North Carolina Court of Appeals does not constitute controlling legal authority. Citation is disfavored, but may be permitted in accordance with the provisions of Rule 30(e)(3) of the North Carolina Rules of Appellate Procedure.

IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA24-838

Filed 7 January 2026

Washington County, No. 19CR050294-930

STATE OF NORTH CAROLINA

v.

TERRANCE LAMONT WILLIAMS, Defendant.

Appeal by Defendant from judgment entered 14 November 2023 by Judge William D. Wolfe in Washington County Superior Court. Heard in the Court of Appeals 20 May 2025.

> *Attorney General Jeff Jackson, by Senior Deputy Attorney General Asher P. Spiller, for the State.*

> *Appellate Defender Glenn Gerding, by Assistant Appellate Defender Amanda S. Zimmer, for Defendant.*

CARPENTER, Judge.

Terrance Lamont Williams ("Defendant") appeals from judgment entered after a jury found him guilty of one count of first-degree murder. On appeal, Defendant argues the trial court erred by: (1) allowing officers to identify Defendant in a surveillance video; (2) allowing a witness to invoke his Fifth Amendment right against self-incrimination in the presence of the jury; (3) failing to strike a witness'

testimony after the witness refused to answer questions; (4) admitting a report addressing the contents of a phone; (5) admitting statements made by Defendant during a jail phone call; (6) failing to intervene *ex mero motu* during the State's closing argument; (7) denying the jury's request to review witness testimony; (8) denying Defendant's motion to dismiss the first-degree murder charge; and (9) denying Defendant a fair trial based on cumulative error. After careful review, we discern no error.

## I. Factual & Procedural Background

On 30 September 2019, a Washington County grand jury indicted Defendant for one count each of first-degree murder and possession of a firearm by a felon. The charges against Defendant stemmed from the fatal shooting of Shakur Hedgebeth on 21 August 2019. On 6 November 2023, Defendant's case proceeded to trial and the evidence tended to show the following.

Hedgebeth, Jahmal James, Tamone Bennett, Deandre Howell, and Defendant grew up as friends. The group referred to Defendant as "T," which was his "street name." Defendant was also friends with Shekiyla Jones, Hedgebeth's sister. On multiple occasions, Defendant and other members of the group attended dinner at the home of Hedgebeth's mother, Lashon Gillard. Eventually, the friend group fell apart due to growing conflict among Hedgebeth, Howell, Bennett, and James.

On 21 August 2019, officers received reports of a shooting outside Carol's Variety Shop in Plymouth, North Carolina. When officers arrived, they discovered

Hedgebeth the ground outside the shop with multiple gunshot wounds. Hedgebeth succumbed to his gunshot wounds.

At trial, the State introduced surveillance footage from the shop showing Defendant arriving in James' car at approximately 7:34 p.m. Defendant had a thick beard and was wearing a white tank top, baggy light-colored pants, and thick dark-framed glasses. Upon his arrival, Defendant entered the shop and waited in line to purchase a beverage. At approximately 8:47 p.m., Hedgebeth arrived at the shop. The footage depicts Hedgebeth walking outside of the shop before abruptly ducking and fleeing the shop. A man, later identified by witnesses at trial as Defendant, chased Hedgebeth with his arm outstretched, wielding a gun. As Hedgebeth exited the frame of the surveillance footage, another man outside the shop, Walter Phelps, also fired a gun.

Chief Willie Ray Williams of the Plymouth Police Department, Special Agent Randall Cox of the North Carolina State Bureau of Investigation, and Investigators Melissa Christine Spence and Frank William Mitchell of the Plymouth Police Department all identified Defendant as the man in the footage chasing Hedgebeth with a gun. All four officers testified to their previous encounters with Defendant and his physical characteristics.

Chief Williams knew Defendant for approximately twenty years, encountered Defendant in the community twenty times, and conversed with Defendant an additional seven or eight times. Special Agent Cox knew Defendant for

approximately five years and interacted with Defendant numerous times, including an interview that lasted several hours. Investigator Spence observed Defendant nearly fifty times and had several face-to-face conversations with Defendant. Investigator Mitchell also encountered Defendant on five or more occasions, some of which were face-to-face. All four officers testified that due to their familiarity with Defendant's height, complexion, hairline, glasses, and beard, they could positively identify Defendant in the surveillance footage.

Officers found Hedgebeth's body at the end of a "heavy blood trail" next to a van parked beside a fence. Hedgebeth was fatally shot five times in the back. One entrance wound in Hedgebeth's back was consistent with Hedgebeth lying face-down when the shot was fired. Officers recovered a shell casing outside the shop near the location where Defendant initially aimed his gun at Hedgebeth. The five shots occurred along Defendant's flight path.

The day after the shooting, Special Agent Cox engaged in an unrelated car chase with James, who was driving the same car Defendant drove to the shop the night before. After searching the car, Special Agent Cox discovered an extended round magazine for a nine-millimeter Glock under the driver's seat. Special Agent Cox also found two phones in the car and a backpack containing marijuana, crack cocaine, and cash.

Records from the phones recovered from James' car demonstrated that a person named "T" in James' phone called and texted James numerous times on the

day Hedgebeth was shot. The records showed that James answered calls immediately before and after the shooting. James' phone no longer showed the phone calls from "T" on the day of the shooting in the call history, indicating the phone calls had been deleted. The State used this evidence to support its theory that Defendant and James were involved with drugs and that Hedgebeth's death resulted from a feud involving drugs.

On 27 August 2019, officers arrested Defendant at his home and searched his residence, recovering a broken cell phone and a package of ammunition purchased on 22 August 2019. Officers also found a rag, key ring, grey pants, and black tennis shoes. The pants and shoes did not have "primer" gunshot residue particles but did contain various particles found in gunshot residue.

In October 2023, Defendant made various calls from jail while awaiting trial. During one call, Defendant commented on the contents of the surveillance footage from Carol's Variety Shop. In a different call, Defendant discussed the broken phone officers recovered from his residence.

Anthony Jackson, Hedgebeth's best friend, testified that he met Defendant while they were both in the same jail "pod." Jackson testified that he confronted Defendant after he heard of Hedgebeth's death. In response, Defendant told Jackson that Defendant "got" Hedgebeth and "don't make me get you." Jackson understood Defendant's statements to mean "I killed your homey, I'll kill you." Jackson also testified that he heard Defendant discuss the State's evidence against him for

Hedgebeth's murder. Jackson understood Defendant's statements to mean the State did not have sufficient evidence identifying Defendant "except the glasses."

The State also called Phelps to testify. Phelps was incarcerated under a material witness order. After granting Phelps immunity at the State's request, the trial court ordered Phelps to appear and testify about his role, the role of others, and additional information regarding Hedgebeth's murder. The State informed the United States Department of Justice that Phelps would testify under an order of the trial court, and the Department of Justice confirmed they would not utilize Phelps' testimony given under the material witness order in any federal prosecution. Before Phelps took the stand, defense counsel informed the trial court that he anticipated Phelps would invoke the Fifth Amendment and requested Phelps do so outside the presence of the jury. The trial court noted that Phelps had immunity and could not effectively invoke the Fifth Amendment.

Phelps testified regarding his "close" relationship with Hedgebeth. When asked whether he knew Defendant, Phelp's declined to answer on Fifth Amendment grounds. The trial court told Phelps, "you don't have that protection. I'm ordering you to answer the question." Phelps refused to answer any further questions, and the trial court found Phelps in contempt of the material witness order.

On 14 November 2023, the jury found Defendant guilty of first-degree murder and possession of a firearm by a felon. That same day, the trial court granted Defendant's motion for judgment notwithstanding the verdict regarding the

possession of a firearm by a felon charge. Thereafter, the trial court entered judgment and sentenced Defendant to life imprisonment without the possibility of parole. Defendant gave oral notice of appeal in open court.

## II. Jurisdiction

This Court has jurisdiction under N.C. Gen. Stat. §§ 7A-27(b)(1) and 15A-1444(a) (2023).

## III. Issues

The issues are whether the trial court erred by: (1) allowing officers to identify Defendant in a surveillance video; (2) allowing a witness to invoke his Fifth Amendment right against self-incrimination in the jury's presence; (3) failing to strike a witness' testimony after the witness refused to answer questions; (4) admitting a report addressing the contents of a phone; (5) admitting statements made by Defendant during a jail phone call; (6) failing to intervene *ex mero motu* during the State's closing argument; (7) denying the jury's request to review witness testimony; (8) denying Defendant's motion to dismiss the first-degree murder charge; and (9) denying Defendant a fair trial based on cumulative error.

## IV. Analysis

### A. Identification

First, Defendant argues the trial court abused its discretion by allowing four officers to identify Defendant in the surveillance footage from Carol's Variety Shop. Specifically, Defendant argues that the testimony of the four officers was improper

lay witness testimony, and needlessly cumulative and unfairly prejudicial. We disagree.

"[W]hether a lay witness may testify as to an opinion is reviewed for abuse of discretion." *State v. Washington*, 141 N.C. App. 354, 362, 540 S.E.2d 388, 395 (2000). Rule 403 challenges are also reviewed for abuse of discretion. *State v. Richardson*, 385 N.C. 101, 154, 891 S.E.2d 132, 176 (2023). " 'An abuse of discretion results only where a decision is manifestly unsupported by reason or so arbitrary that it could not have been the result of a reasoned decision.' " *State v. Black*, 197 N.C. App. 731, 733–34, 678 S.E.2d 689, 691 (2009) (quoting *Clark v. Sanger Clinic*, 175 N.C. App. 76, 84, 623 S.E.2d 293, 299 (2005)).

"Ordinarily, opinion evidence of a non-expert witness is inadmissible because it tends to invade the province of the jury." *State v. Fulton*, 299 N.C. 491, 494, 263 S.E.2d 608, 610 (1980). Nevertheless, lay opinion testimony is admissible when it is "limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of his testimony or the determination of a fact in issue." N.C. Gen. Stat. § 8C-1, Rule 701 (2023).

> The current national trend is to allow lay opinion testimony identifying the person, usually a criminal defendant, in a photograph or videotape where such testimony is based on the perceptions and knowledge of the witness, the testimony would be helpful to the jury in the jury's fact-finding function rather than invasive of that function, and the helpfulness outweighs the possible prejudice to the defendant from admission of the testimony.

*State v. Belk*, 201 N.C. App. 412, 415, 689 S.E.2d 439, 441 (2009) (quoting *State v. Buie*, 194 N.C. App. 725, 730, 672 S.E.2d 351, 355 (2009)). When an officer identifies a suspect on the stand, we "must uphold the admission of [an officer's] lay opinion testimony if there was a rational basis for concluding that [the officer] was more likely than the jury to correctly identify [the defendant] as the individual in the surveillance footage." *Id.* at 417, 689 S.E.2d at 442.

Here, Chief Williams, Special Agent Cox, and Investigators Spence and Mitchell testified about Defendant's appearance, including his height, glasses, beard, and hair. Moreover, all four officers testified to the duration they had known Defendant and to their prior encounters with Defendant where they observed Defendant's physical characteristics. All four officers positively identified Defendant in the surveillance footage.

Defendant does not dispute that the four officers were familiar with his appearance. Rather, Defendant argues the officers' testimony was not rationally based on their perception or helpful to the jury because the security footage was grainy and pixelated. But as this Court explained in *Belk*, "lay opinion identification testimony is *more* likely to be admissible . . . where the surveillance photograph is of *poor or grainy quality*, or where it shows only a partial view of the subject." *Id.* at 416, 689 S.E.2d at 442 (emphases added). Under these circumstances, the officers' testimony was admissible and helpful to the jury. Based on their previous encounters

with Defendant and their knowledge of Defendant's physical characteristics, the officers were "more likely than the jury to identify Defendant as the individual in the surveillance footage." *See id.* at 417, 689 S.E.2d at 443. Accordingly, the trial court did not abuse its discretion by allowing the four officers to positively identify Defendant in the surveillance footage.

Under Rule 403, relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." N.C. Gen. Stat. § 8C-1, Rule 403 (2023). As discussed above, the officers' testimony identifying Defendant in the surveillance footage is highly probative given the quality of the footage. Further, the testimony was not unfairly prejudicial as other evidence demonstrated Defendant's physical characteristics and placed him at Carol's Variety Shop the night the surveillance video was taken. This evidence includes, but is not necessarily limited to, the testimony of Jones and Gillard describing Defendant's physical characteristics and Jackson's testimony that Defendant admitted to killing Hedgebeth. Therefore, the increased probative value of the identification testimony was not substantially outweighed by the danger of unfair prejudice.

Moreover, the officers' testimony was not needlessly cumulative. Although all four officers positively identified Defendant in surveillance footage, each officer knew Defendant for different durations and under different circumstances. Thus, each

officer's testimony "contribut[ed] individual value to the State's case" and having all four officers testify was not "unnecessarily duplicative and excessive." *See State v. Gillard*, 386 N.C. 797, 830, 909 S.E.2d 226, 256 (2024). Therefore, the trial court did not abuse its discretion by allowing the officers' testimony.

**B. Fifth Amendment**

Next, Defendant argues the trial court erred by allowing Phelps to attempt to invoke his Fifth Amendment right against self-incrimination in the jury's presence. According to Defendant, allowing Phelps to testify and invoke the Fifth Amendment was unfairly prejudicial and denied Defendant the right to cross-examine Phelps.

Where it is anticipated that a witness will invoke his Fifth Amendment right against self-incrimination, the decision whether to permit the State to call that witness in the presence of the jury is reviewed for abuse of discretion. *State v. Pickens*, 346 N.C. 628, 639, 488 S.E.2d 162, 168 (1997). " 'An abuse of discretion results only where a decision is manifestly unsupported by reason or so arbitrary that it could not have been the result of a reasoned decision.' " *Black*, 197 N.C. App. at 733–34, 678 S.E.2d at 691 (quoting *Clark*, 175 N.C. App. at 84, 623 S.E.2d at 299).

Difficulties arise "when a witness is presented and then refuses to testify by asserting his Fifth Amendment privilege" because "it permits the party calling the witness to build or support his case out of improper speculation or inferences that the jury may draw from the witness' exercise of the privilege, which cannot be adequately corrected by trial court instruction." *Pickens*, 346 N.C. at 639, 488 S.E.2d at 168. It

also "encroaches upon the constitutional right to confrontation because the presentation of the exercise of the privilege cannot be tested for relevance or value through cross-examination." *Id.* at 639, 488 S.E.2d at 168. As a result, the trial judge " 'should closely scrutinize' " any request to call a witness who is anticipated to invoke his Fifth Amendment right against self-incrimination and balance the interests to determine whether the evidence violates Rule 403. *Id.* at 639, 488 S.E.2d at 168 (quoting *U.S. v. Vandetti*, 623 F.2d 1144, 1147 (6th Cir.1980)).

Here, the trial court correctly concluded that Phelps was not entitled to Fifth Amendment protection. Indeed, Phelps was obligated to testify in exchange for immunity. During trial, when Phelps refused to answer any questions regarding Defendant, the trial court held Phelps in contempt. Because of Phelps' immunity and his inability to invoke the Fifth Amendment, the trial court and State could not reasonably anticipate that Phelps would refuse to questions. *See id.* at 639, 488 S.E.2d at 168. Accordingly, the trial court did not abuse its discretion by allowing the State to call Phelps to the stand to testify.

Defendant also argues the trial court erred by not sua sponte striking Phelps' testimony after Phelps refused to answer questions. Specifically, Defendant contends Phelps was removed from the courtroom before Defendant had the opportunity to cross examine him, rendering Phelps' testimony incompetent.

Defendant did not object or move to strike Phelps' testimony at trial and specifically and distinctly argues plain error. Thus, we review the trial court's failure

to sua sponte strike the testimony for plain error. *See* N.C. R. App. P. 10(a)(4). To establish plain error, a defendant must show: (1) "a fundamental error occurred at trial;" (2) "the error had a probable impact on the outcome, meaning that absent the error, the jury would have returned a different verdict;" and (3) "the error is an exceptional case that warrants plain error review, typically by showing that the error seriously affects the fairness, integrity or public reputation of judicial proceedings." *See State v. Reber*, 386 N.C. 153, 158, 900 S.E.2d 781, 786 (2024) (cleaned up).

In certain circumstances, our Supreme Court has recognized that permitting a witness to assert their Fifth Amendment right in front of the jury can conflict with the defendant's Sixth Amendment right to confront that witness. *See State v. Ray*, 336 N.C. 463, 469, 444 S.E.2d 918, 922 (1994); *see also* U.S. Const. Amend. VI. However, "if the witness invokes [the Fifth Amendment] privilege in response to questions regarding collateral matters, there is little danger of prejudice . . . ." *Ray*, 336 N.C. App. at 470, 444 S.E.2d at 923. But "if the questions relate to the details of the direct examination, 'there may be substantial danger of prejudice because the defense is deprived of the right to test the truth of [the] direct testimony, and therefore, that witness's testimony should be stricken in whole or in part.'" *Id.* at 470, 444 S.E.2d at 923 (alteration in original) (quoting *U.S. v. Cardillo*, 316 F.2d 606, 611 (2d Cir. 1963)). Therefore, a witness "will not be permitted to disclose part of the facts" on direct examination and "withhold the rest" on cross-examination "under the rule that he shall not incriminate himself." *Id.* at 470, 444 S.E.2d at 923 (quoting

*State v. Perry*, 210 N.C. 769, 797–98, 188 S.E. 639, 640 (1936)).

In the present case, Phelps' testimony included no detail from which "there may be substantial danger of prejudice" to Defendant. *See id.* at 470, 444 S.E.2d at 923. Before being held in contempt, Phelps only testified that he knew Hedgebeth, he and Hedgebeth were "close," and Hedgebeth was "like his cousin" before refusing to answer any more questions. Phelps' testimony did not reveal any information the jury did not otherwise hear at trial, and any vague inferences arising from Phelps' refusal to testify did not lend "critical weight" to the State's case. *See Douglas v. Alabama*, 380 U.S. 415, 420, 85 S. Ct. 1074, 1077, 13 L. Ed. 2d 934 (1965). As the trial court did not err, it did not plainly err.

**C. Phone Report**

Defendant also asserts the trial court erred by admitting the report regarding the contents of a phone found in James' car because the contents were irrelevant and unauthenticated.

"Whether evidence is relevant is a question of law that we review *de novo*." *State v. Broussard*, 239 N.C. App. 382, 387, 768 S.E.2d 367, 371 (2015). We also review authentication issues de novo. *State v. Clemons*, 274 N.C. App. 401, 412, 852 S.E.2d 671, 678 (2020). Under de novo review, this Court "'considers the matter anew and freely substitutes its own judgment' for that of the lower tribunal." *State v. Williams*, 362 N.C. 628, 632–33, 669 S.E.2d 290, 294 (2008) (quoting *In re Greens of Pine Glen Ltd. P'ship*, 356 N.C. 642, 647, 576 S.E.2d 316, 319 (2003)).

Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." N.C. Gen. Stat. § 8C-1, Rule 401 (2023). " '[E]vidence is relevant if it has any logical tendency, however slight, to prove a fact in issue in the case.' " *State v. Ross*, 207 N.C. 379, 399, 700 S.E.2d 412, 425 (2010) (quoting *State v. Tadeja*, 191 N.C. App. 439, 444, 664 S.E.2d 402, 407 (2008)). Moreover, our Supreme Court has instructed that the standard for relevancy is "relatively lax." *State v. McElrath*, 322 N.C. 1, 13, 366 S.E.2d 442, 449 (1988). "

'[E]very writing sought to be admitted must first be properly authenticated.' " *Clemons*, 274 N.C. App. at 414, 852 S.E.2d at 679 (quoting *State v. Allen*, 258 N.C. App. 285, 288, 812 S.E.2d 192, 195 (2018)). "The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." N.C. Gen. Stat. § 8C-1, Rule 901 (2023).

Here, the phone records demonstrated that James communicated with "T" on the day of the murder, deleted phone calls, and did not answer any calls during the time frame of Hedgebeth's killing. Given the State's theory that Defendant and James were involved with drugs and that Hedgebeth's death resulted from a feud involving drugs, the phone report is relevant. *See* N.C. Gen. Stat. § 8C-1, Rule 401.

The State also properly authenticated the phone report and the identity of the contact named "T" referenced in the report. The State introduced evidence

demonstrating: Defendant was known in his friend group as "T;" Defendant and James were friends; one text from "T" on the afternoon of Hedgebeth's killing indicated that James was going to pick "T" up later that day; Defendant was in James' car around five hours after that text was sent; and the phone was discovered in James' car. The State's evidence is "sufficient to support a finding" that Defendant made the text messages and phone calls included in the phone report, despite James' attempt to delete them. *See* N.C. Gen. Stat. § 8C-1, Rule 901. Because the phone report was relevant and properly authenticated, the trial court did not err.

**D. Jail Call**

Defendant further argues the trial court erred by admitting statements made by Defendant during a jail phone call because they were irrelevant and unfairly prejudicial.

"Whether evidence is relevant is a question of law that we review *de novo*." *Broussard*, 239 N.C. App. at 387, 768 S.E.2d at 371. Under de novo review, this Court "'considers the matter anew and freely substitutes its own judgment' for that of the lower tribunal." *Williams*, 362 N.C. at 632–33, 669 S.E.2d at 294 (quoting *In re Greens of Pine Glen Ltd. P'ship*, 356 N.C. at 647, 576 S.E.2d at 319). Rule 403 challenges are reviewed for abuse of discretion. *Richardson*, 385 N.C. at 154, 891 S.E.2d at 177. " 'An abuse of discretion results only where a decision is manifestly unsupported by reason or so arbitrary that it could not have been the result of a reasoned decision.' " *Black*, 197 N.C. App. at 733–34, 678 S.E.2d at 691 (quoting

*Clark*, 175 N.C. App. at 84, 623 S.E.2d at 299).

Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." N.C. Gen. Stat. § 8C-1, Rule 401. Under Rule 403, relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice . . . ." N.C. Gen. Stat. § 8C-1, Rule 403.

Here, Defendant made several jail phone calls in October 2023 before his trial, which began on 6 November 2023. During a call on 19 October, Defendant said:

> [T]he video ain't got [anything] on there, you know what I'm saying? The video ain't got no [] murder . . . . Yeah, because I told them -- like they come about, yeah, they got the phone. I'm like bro, the phone they got, that [] was broke . . . They ain't got no phone -- they ain't getting no phone.

These statements are relevant because they pertain to evidence used against Defendant at trial—the surveillance footage and the broken phone recovered from Defendant's residence. *See* N.C. Gen. Stat. § 8C-1, Rule 401. Moreover, these statements tend to support the State's theory that Defendant disposed of a phone used during the night of Hedgebeth's killing. The probative value of these statements is not substantially outweighed by any unfair prejudice. *See* N.C. Gen. Stat. § 8C-1, Rule 403. Accordingly, the trial court did not err by admitting Defendant's jail phone call.

**E. Closing Argument**

Next, Defendant argues the trial court erred by failing to intervene *ex mero motu* during the State's closing argument at trial. Defendant contends the State's argument was grossly improper because the State misstated the law and misrepresented the evidence.

Defendant did not object to any portion of the State's closing argument. Thus, we consider "whether the remarks were so grossly improper that the trial court committed reversible error by failing to intervene ex mero motu." *State v. Huey*, 370 N.C. 174, 179, 804 S.E.2d 464, 469 (2017) (quoting *State v. Jones*, 335 N.C. 117, 133, 558 S.E.2d 97, 107 (2002)). We must consider: "(1) whether the argument was improper; and, if so, (2) whether the argument was so improper as to impede the defendant's right to a fair trial." *Id.* at 179, 804 S.E.2d at 469.

Defendant challenges the State's remarks about: (1) Phelps invoking the Fifth Amendment; (2) Defendant's involvement in drug trafficking and a previous drug conviction; (3) statements from Jones and Gillard about Hedgebeth's falling out with Defendant; (4) Agent Evans' testimony regarding the direction of the shots that killed Hedgebeth; (5) Defendant disposing of evidence; and (6) the phone report.

Regarding the first statement, the State argued during its closing that Phelps invoking the Fifth Amendment and refusing to answer questions was proof that Phelps feared Defendant and violent retaliation. Even assuming arguendo this remark was improper, it was not so grossly improper as to render Defendant's trial

fundamentally unfair and warrant *ex mero motu* intervention by the trial court. The evidence against Defendant was overwhelming, including but not limited to: multiple witnesses identifying Defendant as the man captured in surveillance footage chasing Hedgebeth with a gun; forensic evidence regarding shell casings collected along Hedgebeth's flight path; Defendant's admissions to a fellow inmate and jail phone calls; messages and calls between Defendant and James immediately before and after Hedgebeth's murder; and Defendant's involvement in drug trafficking and falling out with Hedgebeth.

The remaining statements were proper as the State was reciting admissible or unchallenged evidence presented at trial. *See State v. Jones*, 355 N.C. 117, 127, 558 S.E.2d 97, 103 (2002) ("A lawyer's function during closing argument is to provide the jury with a summation of the evidence . . . ."). Accordingly, the trial court did not reversibly err by not intervening *ex mero motu* during the State's closing argument.

**F. Jury's Request**

Defendant also argues the trial court erred by denying the jury's request to review witness testimony.

"If the jury after retiring for deliberation requests a review of certain testimony or other evidence, the jurors must be conducted to the courtroom." N.C. Gen. Stat. § 15A-1233(a) (2023). "The judge in his discretion . . . may direct that requested parts of the testimony be read to the jury and may permit the jury to reexamine in open court the requested materials admitted into evidence." *Id.* "When the trial court

gives no reason for a ruling that must be discretionary, we presume on appeal that the court exercised its discretion." *State v. Starr*, 365 N.C. 314, 318, 718 S.E.2d 362, 365 (2011). Additionally, when there are " 'ambiguous statement[s] capable of multiple interpretations, the presumption . . . is not overcome.' " *State v. Vann*, 386 N.C. 244, 253, 900 S.E.2d 638, 645 (2024) (quoting *State v. Pickens*, 385 N.C. 351, 364, 893 S.E.2d 194 (2023)). " 'An abuse of discretion results only where a decision is manifestly unsupported by reason or so arbitrary that it could not have been the result of a reasoned decision.' " *Black*, 197 N.C. App. at 733–34, 678 S.E.2d at 691 (quoting *Clark*, 175 N.C. App. at 84, 623 S.E.2d at 299).

In this case, during deliberations, the jury requested to review various exhibits and the testimony of Jones and Gillard. The trial court granted the jury's request to review the exhibits. Without objection from Defendant, the trial court denied the jury's request to review a transcript of the testimony of Jones and Gillard. In denying the jury's request, the trial court said it was "not inclined to do anything about their request to see testimony" and "I can't accommodate [the request to see the testimony]."

The trial court demonstrated it exercised discretion by denying one request and granting the other. In addition, the use of the word "inclined" by the trial court when denying the jury's request indicates an exercise of discretion. Even if the trial court's statement that it "can't accommodate" the jury's request to see the testimony creates some level of ambiguity, "ambiguous statement[s] capable of multiple

interpretations" are insufficient to overcome the presumption that the trial court exercised discretion. *See Vann*, 386 N.C. at 253, 900 S.E.2d at 645 (cleaned up). Accordingly, the trial did not abuse its discretion by denying the jury's request to review testimony.

**G. Motion to Dismiss**

Defendant next argues the trial court erred by denying his motion to dismiss. In particular, Defendant asserts the State presented insufficient evidence of identity and intent.

We review the trial court's denial of a motion to dismiss de novo. *State v. Miles*, 222 N.C. App. 593, 599, 730 S.E.2d 816, 822 (2012). Under de novo review, this Court "'considers the matter anew and freely substitutes its own judgment' for that of the lower tribunal." *Williams*, 362 N.C. at 632–33, 669 S.E.2d at 294 (quoting *In re Greens of Pine Glen Ltd. P'ship*, 356 N.C. at 647, 576 S.E.2d at 319).

In reviewing a motion to dismiss, "the question for the Court is whether there is substantial evidence (1) of each essential element of the offense charged, or of a lesser offense included therein, and (2) of defendant's being the perpetrator of such offense." *State v. Powell*, 299 N.C. 95, 98, 261 S.E.2d 114, 117 (1980). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *State v. Smith*, 300 N.C. 71, 78–79, 265 S.E.2d 164, 169 (1980). We view "the evidence in the light most favorable to the State, giving the State every reasonable inference therefrom, and resolving any contradictions or discrepancies in

the State's favor." *State v. Miles*, 222 N.C. App. 593, 599, 730 S.E.2d 816, 822 (2012). "Circumstantial evidence may withstand a motion to dismiss and support a conviction even when the evidence does not rule out every hypothesis of innocence." *State v. Stone*, 323 N.C. 447, 452, 373 S.E.2d 430, 433 (1988). It is the jury's role to resolve any contradictions in the evidence and " 'decide whether the facts, taken singly or in combination, satisfy it beyond a reasonable doubt that the defendant is actually guilty.' " *State v. Taylor*, 337 N.C. 597, 604, 447 S.E.2d 360, 365 (1994) (quoting *State v. Rowland*, 263 N.C. 353, 358, 139 S.E.2d 661, 665 (1965)).

In the light most favorable to the State, the evidence tended to show Defendant was the perpetrator of Hedgebeth's murder. As established above, four officers testified to their knowledge of Defendant's appearance and identified Defendant in the surveillance footage based on that knowledge. Moreover, Jones and Gillard testified to Defendant's physical characteristics and to his previous friendship with Hedgebeth. The jury viewed the surveillance footage from Carol's Variety Shop, depicting an individual consistent with Defendant's physical characteristics. Additionally, a witness testified that Defendant admitted to killing Hedgebeth.

Altogether, the State's evidence raised more than "a suspicion or conjecture as to . . . the identity of" Defendant as the perpetrator of Hedgebeth's murder. *See State v. Barnes*, 334 N.C. 67, 75, 430 S.E.2d 914, 918–19 (1993). Although the State's evidence may not "rule out every hypothesis of innocence," *see Stone*, 323 N.C. at 452, 373 S.E.2d at 433, it is the jury's role to "decide whether the facts, taken singly or in

combination, satisfy [it] beyond a reasonable doubt that the defendant is actually guilty," *see Taylor*, 337 N.C. at 604, 447 S.E.2d at 365.  Accordingly, because the State presented sufficient evidence of Defendant's identity, the trial court did not err by denying Defendant's motion to dismiss.

As to the State's evidence of Defendant's intent, Defendant does not argue the evidence failed to demonstrate that he had the specific intent to kill Hedgebeth. Rather, Defendant argues that the State failed to prove he had a motive, but this argument has no merit.  *See State v. Smith*, 289 N.C. App. 233, 252, 888 S.E.2d 706, 722 (2023) ("[T]he State is not required to prove motive in first-degree murder."). Accordingly, the trial court did not err in denying Defendant's motion to dismiss.

**H. Cumulative and Prejudicial Error**

Finally, Defendant argues each error in isolation constitutes prejudicial error and that the cumulative effect of the errors was sufficiently prejudicial as to warrant a new trial.

Prejudicial error occurs "when there is a reasonable possibility that, had the error in question not been committed, a different result would have been reached at the trial . . . ." N.C. Gen. Stat. § 15A-1443 (2023).  "Cumulative errors lead to reversal when 'taken as a whole' they deprived '[the] defendant of his due process right to a fair trial free from prejudicial error.'"  *State v. Wilkerson*, 363 N.C. 382, 426, 683 S.E.2d 174, 201 (2009) (alteration in the original) (quoting *State v. Canady*, 355 N.C. 242, 254, 559 S.E.2d 762, 768 (2002)).

As detailed above, the trial court did not err. Accordingly, Defendant's prejudicial and cumulative error arguments have no merit.

## V. Conclusion

For these reasons, we hold Defendant received a fair trial, free of prejudicial error.

NO ERROR.

Judges STROUD and WOOD concur.

Report per Rule 30(e).